Agnes McCue, Addressed as the Transferee of the Estate of John J. Nolan, Deceased v. Commissioner. Agnes McCue, Addressed as the Custodian (Statutory Executrix) of the Estate of John J. Nolan, Deceased v. Commissioner. Agnes McCue v. Commissioner.
Agnes McCue, Addressed as the Transferee of the Estate of John J. Nolan v. Commissioner
Docket Nos. 233, 234, 315.
United States Tax Court
1946 Tax Ct. Memo LEXIS 248; 5 T.C.M. (CCH) 141; T.C.M. (RIA) 46059; March 4, 1946
Herman A. Fischer, Esq., 1 N. LaSalle St., Chicago, Ill., and Arnold R. Baar, Esq., 11 S. LaSalle St., Chicago, Ill., for the petitioner. Prew Savoy, Esq., intervenor. John D. Kiley, Esq., and David F. Long, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion These three cases were consolidated for hearing and decision. Nos. 233 and 234 involve the liability of petitioner for Federal estate taxes and penalties owed by the estate of John J. Nolan, deceased, respectively, in her capacity as transferee of John J. Nolan's estate and *249 as statutory executrix. No. 315 involves the same petitioner's liability for income taxes and penalties for the years 1937 and 1938. Marcella Beerly, daughter of the decedent and at the present time his administratrix, filed as brief as intervenor in No. 234. The several amounts in question are as follows: Docket No.
Name
Estate Tax
Penalty
233
Agnes McCue, transferee of the estate of John J. Nolan,
deceased
$ 62,791.22 *
$15,697.81 *
234
Agnes McCue, custodian (statutory executrix) of the estate
of John J. Nolan, deceased
62,791.22 *
15,697.81 *
Year
Income Tax
Penalty
315
Agnes McCue
1937
$189,839.00
$94,919.50
1938
148.06
The questions raised are various but fall into certain definite categories, the primary ones being (1) whether certain realty and securities were owned by decedent Nolan, who died on June 29, 1937, in whole or in part, and are therefore includible in his gross estate; (2) whether certain transfers made to petitioner within 30 days *250 of decedent's death were in contemplation of death; (3) the fair market value at decedent's death of certain securities; and the secondary questions (1) whether petitioner is liable as custodian (statutory executrix of John J. Nolan, deceased, or (2) as transferee of the assets of his estate; and (3) whether, if liability attaches to petitioner in either of these capacities, she is likewise liable for a 25 per cent penalty for failure to file an estate tax return. In the related income tax case we have the principal questions (1) whether petitioner appropriated or embezzled the assets of Nolan's estate in 1937 so as to make her subject to income tax in that year to the extent of the value of this property; (2) whether petitioner is liable for the 50 per cent fraud penalty for failure to report such income; and (3) whether she omitted from her gross income in her 1937 return sums which should have been included therein in excess of 25 per cent of her reported income. The statutory provisions involved and more particular statement of the issues are reserved for our opinion. Findings of Fact The decedent, John J. Nolan, died in Cook County, Illinois, on June 29, 1937. No Federal estate *251 tax return has been filed for John J. Nolan's estate, and no Federal estate tax has been paid on his estate. No executor, executrix, administrator, or administratrix was appointed, qualified, and acting for his estate between September 24, 1940, and December 13, 1943. Marcella Nolan, now Marcella Beerly, the intervenor daughter of the decedent, John J. Nolan, was appointed as administratrix of her father's estate on July 7, 1937 and removed as such by the Probate Court of Cook County on September 24, 1940. She was reappointed administratrix of such estate on December 13, 1943. Prior to September 24, 1940, a claim was filed by the collector of internal revenue on account of distilled spirits taxes assessed against Nolan and 14 others in 1935 in the amount of $139,297.71. As the time when the administratrix was removed and the estate closed in 1940 no adjudication had been made of this claim by the Probate Court. The record does not show whether it was refiled after December 13, 1943. The determinations of deficiency in all three causes #233, #234 and #315, were served on the petitioner and the original petitions and answers thereto were filed with this Court between September 28, 1942, and *252 February 22, 1943, during which time no duly appointed, qualified or acting administratrix existed for Nolan's estate. Agnes McCue, the petitioner, is the widow of Edward J. McCue and the sister of John J. Nolan, the decedent. On the 29th day of June 1937 the petitioner was in the actual or constructive possession of the following real estate described in the above causes as being: (a) 15-apartment building, at 1100-04, North Lawier Ave., Chicago, Ill. (b) 37-apartment building at 5033-41 1/2 Quincy St., Chicago, Ill. (c) Commercial brick building, 7216-18 Circle Ave., River Forest, Ill. (d) Dwelling house at 1045 N. Park Ave., River Forest, Ill. (e) Tavern, at 8107-09 Ogden Avenue, Lyons, Ill. (f) Lot, 7238 Circle Ave., River Forest, Ill. (g) Garage building, 3437-39 S. Hermitage Ave., Chicago, Ill. (h) Six-room brick bungalow, 5623-25-27 S. Paulina Ave., Chicago. Ill. (i) Improved real estate at 4110 Armitage Ave., Chicago, Ill. (j) Theatre and building at 25 Cass Street. Westmont, DuPage County, Ill. Agnes McCue sold the real estate described as 25 Cass Street, Westmont, Ill., after Nolan's death for about $18,000 after deducting expenses. (k) Commercial *253 frame store building at Southwest corner of Oakwood and Haas Aves., Lyons, Ill., together with all our buildings and grounds belonging thereto and otherwise known as the "Hollywood" cafe or tavern. Possession of this property was subsequently lost as a result of foreclosure proceedings. Except as above noted, petitioner was in possession of these premises up to the date of hearing. On the 29th day of June, 1937, the petitioner was in the actual or constructive possession of the following bonds described in the above causes as being: (a) $32,000 St. Anne Apartment 6 1/2 percent bearer. Serial Nos. 17 to 80, inclusive. (b) $156,000 per value Kankakee Beverage Company 6 percent 1st mortgage bearer bonds. (c) $71,500 par value Courtleigh Apartment bearer bonds. (d) $30,000 par value Eastgate Apartment bearer bonds. (e) $10,000 par value Belporte Apartment bearer bonds. (f) $11,000 Capitol Theatre bearer bonds. (Agnes McCue sold these $11,000 Capitol Theatre bearer bonds in 1944 for about $12,000.) (g) Eden Apartment bonds (par value $35,000). (These were sold by Agnes McCue in 1938 for about $20,000.) On the 29th day of June, 1937, the petitioner was in the actual *254 or constructive possession of the following stocks described in the above causes as being: (a) 100 shares Union Carbide & Carbon common stock, certificate No. B-19679 and B-19680, issued January 11, 1935. (b) 100 shares of Houdaille-Hershey Class B stock, certificate No. CB 4308, issued January 10, 1935. (c) 100 shares Borg Warner Corp., $5 par common stock, certificate No. C-4154, issued May 5, 1937. (d) 12 shares Atlas Corp., 6 percent preferred stock, certificate No. P.O. 13455, issued December 31, 1936. (e) 63 shares Atlas Corp. stock, certificate No. CO 38398, issued December 31, 1936. (f) 100 shares Food Machinery Corp. $100 par value common stock, issued February 27, 1936. (g) 100 shares Advance Aluminum Casting Corporation stock, certificate No. 580, issued June 12, 1936. On June 29, 1937, the real estate described in these causes as being the undivided one-half interest in residence at 1401 N. Lotus Ave., Chicago, Ill., was a part of the gross estate of John J. Nolan, deceased. On June 29, 1937 the real estate described in these causes as being five lots, 5322-24-26-28 W. Division Street, Chicago, Ill., was a part of the gross estate of John J. Nolan, deceased. *255 The values of all the property, both real and personal, above described, except that of the bonds of the Kankakee Beverage Co., have been stipulated by the parties and we find them to be as stipulated. From 1921 to 1933 the decedent, John J. Nolan, was engaged in the business of dealing in illicit liquor, or "bootlegging". This business he operated on a large scale and became notorious as one of the leading and financially successful "bootleggers" in Cook County, Ill. His gross income from this business averaged approximately $15,000 a week. Before 1921 he had been engaged in a small way in the piano business. In July, 1927, he was living with his wife and four children in a brick bungalow located at 1401 North Lotus Ave., Chicago, which was also the headquarters for his business. In the conduct of his business Nolan used many aliases, some of which appear later in these findings. He used so many aliases, or fictitious names, that he kept a record of them in a small book. Although his wife assisted him in his business, Nolan's marital life was a stormy one which culminated in his separation from his wife in 1927 and a bitterly contested divorce action, which was instituted by his *256 wife in the latter part of 1927 or early in 1928, and in which Nolan filed a cross-bill in February, 1928. This action also involved the custody of the children, property rights and marital obligations of support. From about May 7, 1928, to about August 29, 1928, agents of the Treasury Department of the United States investigated the affairs of Nolan upon the suspicion that he was evading the payment of Federal income taxes. These investigations resulted in the making of additional assessments of income taxes against him for the years 1924, 1925, 1926 and 1927 in an aggregate amount of over $1,500,000. These assessments were abated in September, 1932, by reason of a compromise settlement pursuant to which Nolan paid the sum of $35,000. In 1935 an assessment on account of a spirits tax heretofore referred to was made against Nolan and others in a considerable amount, but, although the record does not indicate that Nolan ever questioned his liability therefor, no payments were made by him on this assessment. In order to evade the payment of Federal taxes, and later, for the additional reason of avoiding the claims of his estranged wife, Nolan consistently held property and maintained *257 bank accounts in names other than his own and in this connection used many of the aliases used by him in his illicit business. One bank account at the Prairie State Bank was kept by him in his own name. In the latter part of 1927, Nolan separated from his wife and at the time he left their home he removed a large amount of cash and certified checks issued to him under aliases. He went to the home occupied by his sister, Agnes McCue, the petitioner herein, and her husband, Edward McCue, where he stayed for several months. At some undisclosed subsequent time Nolan lived with a woman named Costain on a farm near Kankakee, Ill., but frequently spent week-ends in the home occupied by the McCues in 1929 and subsequently, and made it his business headquarters when in the city. In this home two of his daughters stayed at irregular periods for indefinite times. In this home he died on June 29, 1937 an illness which had kept him confined there for over a month. Edward McCue, the husband of petitioner, was a likeable, unobtrusive man who was employed from 1907 to May 7, 1927, by the Pennsylvania Monon Railroad as a clerk at salaries ranging from $55 per month to $146.52 per month. When he *258 gave up this employment in 1927 to work full-time for his brother-in-law, Nolan, he was making $137.24 a month as a railroad clerk. He was employed by Nolan on a part-time basis in 1926 but his duties then were unimportant. After 1927 he became, in effect, Nolan's righthand man and acted as his general business agent, collecting for Nolan, handling his funds for him, completing transactions involving Nolan's property either in his own (McCue's) name or under Nolan's aliases, and, in general, acting as Nolan's alter ego. Before his employment by Nolan the latter frequently purchased cashier's checks from the Madison Square Bank payable to fictitious persons. After McCue's employment the purchase of these checks was made by McCue on behalf of Nolan. The extent of McCue's authority to act for Nolan after his employment by Nolan in 1927 is illustrated by the following transaction: In 1928 Nolan deposited $7,800 in cash with John F. Higgins, an attorney, for use in a real estate deal. The deal not going through, Higgins, with Nolan's knowledge and consent, returned the money by means of a check for $7,800 payable to McCue. The record does not disclose what salary he received from Nolan. *259 In 1932 he had a bank account but, aside from four small canceled checks introduced in evidence, we have no information with regard to this account. If he ever had a safe-deposit box it was a joint one with his wife. In 1923 and 1924, before his business association with Nolan, he filed income tax returns showing no taxable income. Thereafter he filed no returns. From 1929 to 1931 he had an account with one stock broker whose record indicates that McCue was a small trader who made little, if any, profits. In 1934 he died and no state inheritance tax or Federal estate tax returns were filed on behalf of his estate. No probate proceedings seem to have been filed after his death. Agnes McCue, the petitioner, was the wife of Edward McCue and sister of Nolan. She was the mother of three children and, until 1927, she had no business experience. The record does not show that Nolan had any other sister or any brothers. Until 1929 Mr. and Mrs. McCue lived in a modest home which they had purchased on the installment plan. After Nolan's separation from his wife in 1927 he began to rely increasingly upon petitioner and her husband, and entrusted his funds and property to the custody and care *260 of Agnes McCue, as well as to Edward McCue, both of whom had access to a safe located in the home occupied by them, and in which Nolan kept his money and other funds and securities. McCue, for the most part, did the "outside" work for Nolan, such as collecting for beer sold, collecting rents from Nolan's property and arranging for repairs and improvements thereon. Agnes McCue assisted in some of the collecting and depositing of funds collected in Nolan's account at the Prairie State Bank. In this way she became well acquainted with Salvatore P. Tomaso, who was an employee and officer of the Prairie State Bank in Oak Park, Ill., a suburb of Chicago, from 1932 to the date of hearing. During the month of March, 1938, after Nolan's death, the petitioner, Agnes McCue, filed income tax returns for the years 1935 to 1937, inclusive. She had never before filed income tax returns. In these returns the petitioner, Agnes McCue, for the first time set out rental income from real estate hereinafter referred to and which may be described as follows: 15-apartment building, 1100-04 North Lawler Ave., Chicago, Ill.; 37-apartment building, 5033-41 1/2 Quincy Street, Chicago, Ill.; Commercial brick *261 building, 7216-18 Circle Avenue, River Forest, Ill.; and improved real estate at 4110 Armitage Avenue, Chicago, Ill. She did not disclose in her returns when she acquired these properties or the amount of their value when acquired. Either in 1937 or 1938 the petitioner rented a safety deposit box at the Oak Park Trust & Savings Bank, Oak Park, Ill., under the assumed name of "Marie Sheridan". Mr. Tomaso was an officer of the Madison Square State Bank from 1924 to 1932. During that time Nolan had accounts in that bank in fictitious names. In 1927 Nolan introduced McCue to Tomaso as "Mr. Mack". Over a year later Tomaso learned that "Mr. Mack" was Edward McCue. When Tomaso went from the Madison Square State Bank to the Prairie State Bank, Nolan shifted his banking business to the latter bank. At both banks Nolan and the McCues transacted business as a regular practice under fictitious names with the knowledge and consent of Tomaso and other officers of the banks. As will hereafter appear Tomaso himself accommodated Nolan and the McCues by signing fictitious names to documents and otherwise cooperated in keeping transactions from disclosing that Nolan and the McCues were involved therein. *262 John McCue, the son of petitioner and Edward McCue, is a draftsman and something of an artist. As will be later set out herein, he signed two names not his own to deeds and endorsed a check by a name not his own. The deeds were thus signed by him at the request of his mother. Tavern, 8107-9 Ogden Avenue, Lyons, Illinois On or about April 28, 1928 Nolan made arrangements for the purchase of a tavern at 8107-9 Ogden Avenue, Lyons, Ill., from Frank Kratoska, title to be taken in the name of Agnes McCue. Those who negotiated the sale were Nolan, Kratoska and the latter's attorney. Neither Agnes McCue nor Edward McCue took any part in these negotiations. Nolan told Richard Huisinga that he owned this real estate and permitted Huisinga to operate the tavern without paying rent from the summer of the year 1928 to the early part of 1930. During this time Huisinga did not know Agnes McCue, and had no financial transactions with Edward McCue, although he saw McCue frequently and Nolan told him that McCue was going to look after his business interests. McCue later collected for beer sold on the premises. In 1934 Henry J. Metz was employed by Nolan to construct an insulated cooler room *263 at the back end of the tavern for the storing of beer. Nolan designed the cooler room, supervised its construction in conjunction with McCue, and informed Metz that the cooler room should be large enough for the storage of a certain number of barrels. After constructing this cooler room, Metz was not paid for it, and in trying to collect this account he learned that the title to the real estate was in the name of Agnes McCue. He filed a suit against Agnes McCue for the foreclosure of his mechanics' lien. At a foreclosure sale ordered in this suit Metz, on September 2, 1936, purchased the tavern, subject to the owner's rights of redemption within twelve months after the sale, for the amount of his lien and the cost of the proceedings. A judgment creditor had the right to redeem within fifteen months after the sale. Andrew D. Jordan, a cousin and attorney for the petitioner, confessed judgment on a judgment note executed by her after Nolan's death without consideration to the order of Jordan for the purpose of constituting him a judgment creditor. Thereafter, in September 1937, Jordan redeemed the property from Metz with money advanced to him by petitioner, obtained a Master's Deed to *264 the real estate and reconveyed it to the petitioner. After Nolan's death Jordan collected the rents from this property. Title to this property was placed in the name of Agnes McCue by Nolan, who was the real purchaser, pursuant to his practice of putting the record title of property acquired by him in the names of relatives or fictitious persons, in order to avoid the demands of his estranged wife and to escape the payment of Federal taxes. It was redeemed by petitioner with funds which had either been entrusted to her by Nolan or represented income derived by her from property entrusted to her by Nolan. Nolan was the equitable owner of this property at the time of his death. Real Estate Bonds On or about June 30, 1927, John J. Nolan purchased from the Madison Square State Bank, Chicago, Ill., for the sum of $101,532.90 the following described real estate bearer bonds, plus accrued interest: 46 - $500 Adams Apartment Bonds, serial numbers 31 to 76, due April 15, 1932; 54 - $500 Gladys Apartment Bonds, serial numbers 44 to 97, due February 5, 1931; 50 - $500 Westgate Apartment Bonds, serial numbers 78 to 127, due June 7, 1933; and 50 - $500 Quincy Apartment Bonds, serial numbers *265 147 to 196, due March 25, 1938. At Nolan's request, the officials of the bank caused their records to show that this purchase was made by "George Ferguson". On or about the same date Nolan purchased from the Madison Square State Bank for the sum of $126,853.41 the following described real estate bonds, plus accrued interest: 70 - $500 Weber Apartment bonds, serial numbers 67 to 136, both inclusive, maturing April 4, 1934; 50 - $500 Eastgate Apartment Bonds, serial numbers 76 to 125, maturing May 10, 1933; 70 - $500 Eden Apartment Bonds, serial numbers 21 to 90, due April 23, 1933; and 60 - $500 Lawler Apartment Bonds, serial numbers 21 to 80, due February 28, 1932. At Nolan's request the bank records showed this sale to have been made to "James Horner". On or about the same date Nolan purchased from the Madison Square State Bank for the sum of $76,625 the following described real estate bonds, plus accrued interest: 50 - $500 Leland Apartment bonds, serial numbers 23 to 72, maturing February 1, 1932; 50 $500 Courtleigh Apartment bonds, serial numbers 66 and 152 to 200, due July 10, 1933; and 50 - $500 St. Anne Apartment Bonds, serial numbers 17 to 66, maturing May 10, 1933. At Nolan's *266 request the records of the bank showed this purchase was made by "Joseph Sullivan". All of these bonds were delivered to Edward McCue, who had accompanied Nolan to the bank when Nolan purchased the bonds. In taking delivery of these bonds McCue was acting as agent for Nolan. Without the following real estate bonds being returned to it, the Madison Square State Bank, on May 21, 1928, in consideration of a service charge or commission, made repurchase records showing a repurchase of the real estate bonds described above and made sale records showing a resale of a part of these bonds in the following names and in the following amounts: 1. 30 - $500 Lawler Apartment bonds, serial numbers 21 to 50, inclusive, to Frank Harper. 2. 15 - $500 Lawler Apartment bonds, serial numbers 51 to 65, inclusive, to James Rush. 3. 15 - $500 Lawler Apartment bonds, serial numbers 66 to 80, inclusive, to Sam Greenberg. 4. 17 - $500 Eden Apartment bonds, serial numbers 21 to 37, inclusive, to James Kelley. 5. 32 - $500 Eden Apartment bonds, serial numbers 38 to 69, inclusive, to Frank Scott. 6. 21 - $500 Eden Apartment bonds, serial numbers 70 to 90, inclusive, to Hugh Tillotson. 7. 5 - *267 $500 Eastgate Apartment bonds, serial numbers 76 to 80, inclusive, to John Beall. 8. 30 - $500 Eastgate Apartment bonds, serial numbers 81 to 110, inclusive, to George Reid. 9. 15 - $500 Eastgate Apartment bonds, serial numbers 111 to 125, inclusive, to Chris Segerson. 10. 25 - $500 Weber Apartment bonds, serial numbers 67 to 91, inclusive, to George Hopson. 11. 29 - $500 Weber Apartment bonds, serial numbers 94 to 122, inclusive, to George Turvey. 12. 16 - $500 Weber Apartment bonds, serial numbers 123 to 136, inclusive, to James Anderson. 13. 13 - $500 Leland Apartment bonds, serial numbers 23 to 35, inclusive, to Joseph Cleary. 14. 18 - $500 Leland Apartment bonds, serial numbers 36 to 53, inclusive, to John Henderson. 15. 19 - $500 Leland Apartment bonds, serial numbers 54 to 72, inclusive, to George Rafferty. 16. 11 - $500 St. Anne Apartment bonds, serial numbers 17 to 27, inclusive, to Frank Lorenz. 17. 30 - $500 St. Anne Apartment bonds, serial numbers 28 to 57, inclusive, to Herbert Klank. 18. 9 - $500 St. Anne Apartment bonds, serial numbers 58 to 66, inclusive, to Joseph Kenney. 19. 19 - $500 Courtleigh Apartment bonds, serial numbers 152 to 170, *268 inclusive, to Paul Hopson. 20. 31 - $500 Courtleigh Apartment bonds, serial numbers 66, and 71 to 200, inclusive, to John Cronin. All of the names used by Nolan and the bank in the transactions set forth above were fictitious or were used without the knowledge of the persons whose names were used. This fact was known to the officials of the bank who also knew that Nolan was a notorious and prosperous bootlegger. In his transactions it was customary for Nolan to use the names of George Ferguson, John or Joseph Sullivan, Joseph Cleary, John Henderson, George Rafferty, Frank Lorenz, John Cronin, James Anderson, Mr. Reid, John Beall, James Rush, Sam Greenberg, John F. Quick, Frank Wagner, Margaret Dempsey, John Roach, Mr. Newman, Edward Schuster, John Leahy, Frank Janda, John Morely, Mary Mulcare, and many others. Most of these were fictitious. Those which were the names of real persons were used without the knowledge or consent of such persons. Apartment Building, 1100-04 N. Lawler Ave., Chicago, Ill. Under date of November 27, 1931, the Pioneer Trust & Savings Bank, as Trustee under Trust Agreement Number 2104, executed a Trustee's deed conveying to "John F. Quick", the real *269 estate described as being a 15-apartment building, 1100-04 North Lawler Avenue, Chicago, Illinois. The Lawler Apartment real estate bonds purchased by Nolan, as heretofore described, were secured by a mortgage on this real estate. During the period October, 1931, to June, 1932, some one in the name of "John F. Quick" expended approximately $25,000 in the purchase of additional bonds secured by this apartment property and the payment of taxes thereon. Nolan, in the spring of 1934, visited Albert B. Schweinsberg and asked for a $15,000 mortgage on this real estate which he said he had in the name of "John F. Quick", and after inspecting it, Albert B. Schweinsberg and Hugo Dalmar called upon Nolan at the Kankakee Beverage Co., at Kankakee, Ill., and made arrangements for a loan of $15,000 on it. Nolan said "John F. Quick" would sign the mortgage papers. On June 4, 1934, a man introduced himself to Schweinsberg and Dalmar as John F. Quick and signed the name of "John F. Quick" on the promissory notes for the $15,000 mortgage on this parcel, and at the same time signed the name of "John F. Quick" on a trust deed, covering the same parcel, made to the Chicago Title and Trust Co. Schweinsberg *270 at the time of the execution of this mortgage had never seen this "John F. Quick" before and did not know any person by the name of Edward J. McCue or Agnes McCue. On June 20, 1934, Dalmar issued his check drawn on the Continental Illinois National Bank & Trust Co. for the sum of $13,572.58 and made payable to "John F. Quick" this amount representing the net proceeds of the $15,000 mortgage. The check was endorsed with the names of John F. Quick and John J. Nolan; and was deposited in the account of Nolan on June 22, 1934, at the Prairie State Bank, Oak Park, Ill. Schweinsberg attended the wake of Edward McCue, who died on October 31, 1934, and for the first time observed that Edward J. McCue was the same person who had signed the promissory notes and trust deed for the $15,000 mortgage as "John F. Quick". About thirty days after the death of McCue, Schweinsberg asked Nolan why McCue represented himself as John F. Quick, and Nolan said "Don't worry, the mortgage will be paid." The name "John F. Quick" was a fictitious name used by John J. Nolan and was signed on the papers in this transaction by McCue at the request of Nolan. In some way unexplained by the record this note and *271 mortgage were acquired by a trust administered by the First National Bank of Chicago. On July 18, 1935, a check dated July 16, 1935, for the sum of $9,000, payable to the order of "Mary Mulcare", another fictitious name sometimes used by Nolan, was cashed at the Prairie State Bank, Oak Park, Illinois. This check represented the net proceeds of a mortgage loan made by "Mary Mulcare" from The Equitable Life Assurance Society dated June 11, 1935, and received by "Mary Mulcare" on July 16, 1935. The loan was secured by a mortgage on property located at 5033 Quincy Street, and is more particularly described later. On the same day, July 18, a cashier's check for the sum of $5,042.78 made payable to the First National Bank of Chicago was purchased at the same Prairie State Bank, and signed "S. P. Tomaso, Asst. Cashier". The Bank, although it listed the names of numerous other purchasers of cashier's checks, failed to make a record of the name of the purchaser of this cashier's check and of a cashier's check payable to one L. Greenberg for $475. The First National Bank of Chicago, payee of the cashier's check dated July 18, 1935, in the amount of $5,042.78, received the check on the same *272 day and credited its amount as a payment on the $15,000 mortgage above. John J. Nolan, on July 7, 1936, under the name of "Charlotte Nolan", obtained a loan of $5,521.21 from the Prairie State Bank, and on the same day a cashier's check for $2,516.04, payable to the order of the First National Bank of Chicago, was purchased at the Prairie State Bank with part of the proceeds of the above loan. Nolan then made a payment with this cashier's check on the $15,000 "John F. Quick" mortgage on the Lawler Apartment Building. The ledger sheet of the First National Bank names the borrower of the $15,000 secured by a mortgage as "John F. Quick (a bachelor) c/o S. P. Tomaso, Prairie State Bank, Oak Park, Illinois", and sets out another address with a line drawn through it as "1319 S. Kenilworth Avenue, Berwyn, Illinois." The address of Nolan on his 1932 income tax return is 1919 S. Kenilworth Ave., Berwyn, Ill. Agnes McCue never lived at this address nor does the record disclose who did live there. David C. Slagle collected the rents on the Lawler Avenue Apartment building from either 1930, 1931 or 1932, to April 13, 1944, for a "John F. Quick" whom he had never met and did not know, and *273 delivered the rents in cash, less monthly expenses, to Salvatore P. Tomaso, an officer of the Prairie State Bank, Oak Park, Ill. Slagle did not know and had never met the petitioner until the trial of these causes. On March 13, 1935, Salvatore P. Tomaso deposited $140 of the income from Lawler Apartment Building in the account of John J. Nolan at the Prairie State Bank and made a deposit slip on which he made a notation "Lawler" in the bottom lefthand corner. On June 2, 1939, after the death of Nolan, John McCue, the son of Agnes McCue, on the instructions of Andrew D. Jordan, a third cousin and attorney for Agnes McCue, signed the name of "John F. Quick" on a warranty deed for the Lawler Apartment which stated that the real estate was conveyed to Andrew D. Jordan, bachelor, for and in consideration of the sum of $10 and other good and valuable consideration. Jordan immediately after the execution of the warranty deed to him by John McCue obtained a loan of $12,000 on this real estate from The Equitable Life Assurance Society representing himself to be the owner. Jordan, after executing promissory notes and a mortgage for the above loan of $12,000 delivered the proceeds of the loan *274 to the petitioner. Jordan received no compensation for the use of his name as grantee in the warranty deed, and for signing his name to the mortgage other than the regular monthly fee he was being paid at the time by Agnes McCue. Jordan was not the equitable owner of the Lawler Apartment Building at 1100-04 N. Lawler Avenue, Chicago, Illinois. At the time of his death Nolan was the beneficial owner of this property. Apartment Building located at 5033-41 1/2 Quincy Street, Chicago, Ill. On March 1, 1932, Leonard Black and Cynthia Black, executed a warranty deed conveying to "Mary Mulcare, spinster", the real estate described as being a 37-apartment building located at 5033-41 1/2 Quincy Street, Chicago, Ill. The Weber Apartment real estate bonds purchased by John J. Nolan, heretofore described, were secured by a mortgage on this property. The decedent, Nolan, occasionally used the name of "Mary Mulcare". On August 1, 1933, for the purchase price $19,900, a Master's Certificate pursuant to a decree of the Superior Court of Cook County, Illinois, was issued to Helen Preiss, for the purchase of the Quincy Street apartment house. Helen Preiss, or her attorney, presented $35,000 in *275 Weber Apartment bonds which were applied on the purchase price. Nolan owned $35,000 in Weber apartment bonds secured by this real estate. On September 9, 1933, this parcel was redeemed in the name of "Mary Mulcare" from Helen Preiss for the recited sum of $19,900. Earlier in 1933 Louis Greenberg, an attorney, was consulted by Nolan in regard to this property. Greenberg asked Helen Preiss to sign a paper for him in the foreclosure proceeding. She did not actually part with any money in the purchase of the parcel and did not receive any money in its redemption. Helen Preiss was the sister of Greenberg's wife and a nominee selected by him. Greenberg executed three receipts to Edward McCue, the first dated April 11, 1933, acknowledging $3,000 paid as a deposit on a bid of not over $23,000, the parcel "to be bid in the name of Helen Preiss, McCue being the real owner of 70 certificates and interest representing both parties. Bonds deposited in court." The second acknowledged receipt from McCue of $14,025 "to be paid Master Bernstein being balance due on Master sale in Rittenberg and Weber et al. property bought in the name of Helen Preiss". The third dated September 8, 1933, acknowledged *276 receipt of $3,000 "to be applied for services in completing work for obtaining title to property at 5041 Quincy Street to Mary Mulcare * * *." Another receipt, dated December 5, 1936 after the death of Edward McCue and before the death of Nolan, signed by Greenberg, was made to "Mary Mulcare" for $100, "being balance due for all services rendered * * *" On December 1, 1934, Greenberg signed a receipt acknowledging that he had received $175 from Mary Mulcare "in suit of Barrett et al. v. Mulcare. Bill for Review" After the death of the petitioner's husband, Edward J. McCue, and about eight months or a year after the death of Nolan, John Higgins, an attorney, informed Agnes McCue that he had learned she had taken possession of the Quincy Street Apartment house under the name of "Mary Mulcare", and Agnes McCue said "You are mistaken. I don't known anything about that building. I don't know anything about that name." Harry E. Hopkins has been the managing agent for the Quincy Street apartment building since 1934. He was employed by Greenberg for the purpose. Not knowing personally the owner of the parcel, Hopkins, between September 5, 1934, and June 5, 1937, made delivery of twelve *277 checks payable to "Mary Mulcare" for rent to the Prairie State Bank, Oak Park, Illinois, at the desk of Salvatore P. Tomaso, an officer of the bank. Of these twelve checks Nolan endorsed the name of "Mary Mulcare" on six of them, and Agnes McCue, his sister, endorsed the name of "Mary Mulcare" on the other six. Nolan endorsed the name of "Mary Mulcare" on a check from Harry E. Hopkins dated March 5, 1935, in the amount of $211.16 for rent on the Quincy Street Apartment house. On March 13, 1935, this check was cashed and Tomaso made a deposit slip for the account of Nolan, and made the notation "Quincy" in the bottom left-hand corner. Tomaso defined this word "Quincy" on the deposit slip as being a collection on the Quincy Apartments. Nolan, about the first part of the year 1935, had a conversation with Alfred B. Schweinsberg and said he might have another loan for him on the Quincy Street Apartment house. He further stated that a person named "Hopkins" managed this real estate and that he had obtained the bonds on this property at the Madison Square State Bank. One June 11, 1935, "Mary Mulcare" mortgage these premises to The Equitable Life Assurance Society as security for a loan *278 of $22,000. Most of the proceeds from this loan were used to pay taxes which were due upon the property and repair bills. The greater part of the balance of the loan was paid to "Mary Mulcare" by check dated July 16, 1935. This check has been heretofore mentioned in connection with the Lawler Avenue property. At the time of his death Nolan was the beneficial owner of this property. $71,500 Par Value Courtleigh Apartment Bonds On January 10, 1934, an agreement to dismiss a foreclosure suit and to extend the maturity date of bonds was entered into between the bondholders of the Courtleigh Apartment Bonds and Fred A. Johnson and Ella L. Johnson, his wife, the owners of the real estate mortgaged to secure these bonds. This agreement bears the names of several persons as bondholders, including that of a "James Kennedy" as representing $30,000 par value of Courtleigh Apartment Bonds, numbers 43, 44, 48 to 53, inclusive, 59, 64, 65, 66, 68, 70, 72 to 200, inclusive. Of these bonds, numbers 66 and 152 to 200, inclusive, in a face amount of $25,000, are identical with the numbers of the Courtleigh Apartment Bonds purchased by Nolan, as above set out. Fred A. Johnson signed the bondholders' *279 agreement, left it with Salvatore P. Tomaso to obtain the signature of "James Kennedy" and did not see anyone sign that name, and did not know who signed or used the name "James Kennedy". For interest payments on the Courtleigh Apartment Bonds represented by "James Kennedy" Johnson issued 8 checks between July 17, 1936, and May 31, 1940. Before Nolan's death, the first three of these checks which were dated July 17, 1936, December 14, 1936, and May 20, 1937, each in the amount of $1,430, were made payable to "James Kennedy" and of these, the two earlier were endorsed "James Kennedy" by Nolan. The five others issued after Nolan's death were made payable to "Currency". All eight checks were drawn on the Prairie State Bank and were delivered by Johnson to Tomaso, who initialed them. Tomaso and Johnson were the committee for the bondholders of the Courtleigh Apartment Bonds. Johnson testified that Tomaso did not tell him who James Kennedy was. On May 15, 1935, Johnson issued a check for $1,430 for interest on the Courtleigh Apartment Bonds, payable to a John Kennedy and this check was endorsed "John Kennedy" by Nolan. On December 12, 1935, Johnson issued a check payable to "John Kennedy" *280 but changed the name of the payee to "James Kennedy". On December 16, 1935, a cashier's check for $1,430 was purchased by Nolan at the Prairie State Bank, made payable to "John Kennedy", and on it Nolan endorsed the name of "John Kennedy". Nolan told Louis Nies that he had everything he owned tied up under different fictitious names, that he owned about 85 percent of the Courtleigh Apartment Bonds, and as collateral for a loan of $5,000 from Louis Nies to the Kankakee Beverage Co., Nolan, about September 21, 1935, placed Courtleigh Apartment Bonds, serial numbers 161 to 200, of a face value of $20,000, with the First National Bank of Chicago. The serial numbers on these bonds are identical with the serial numbers of a part of the Courtleigh Apartment Bonds purchased by Nolan as above set out. This loan from Nies was eventually paid. All of these bonds were either purchased by Nolan or by someone acting on his behalf and using his funds. At the time of his death Nolan was the beneficial owner of these bonds. $30,000 Par Value Eastgate Apartment Bonds On November 16, 1934, a request to continue indefinitely or dismiss foreclosure proceedings was signed by the bondholders of the *281 Eastgate Apartment Bonds. This instrument bears the names of several persons as bondholders including the name of a "Margaret Dempsey" owning Eastgate Apartment Bonds, numbers 76 to 125, in the face amount of $25,000. These bond numbers are identical with the numbers of the Eastgate Apartment Bonds purchased by Nolan, as above set out, but which he caused to be shown as purchased by John Beall, George Reid and Chris Segerson. Fred A. Johnson, manager of the Eastgate Apartments, submitted this instrument to Salvatore P. Tomaso who he supposed was acting as an agent for a Mrs. Dempsey, and did not know who signed the name "Margaret Dempsey" on them. On December 29, 1934 an instrument was signed by the bondholders of the Eastgate Apartment Bonds which ratified all proceedings of a meeting of bondholders held on December 10, 1934, for the selection of a bondholder's committee. Among those selected was Salvatore P. Tomaso. This agreement bears the names of several persons as bondholders including that of "Margaret Dempsey". The handwriting of the name "Margaret Dempsey" on the agreement of November 16, 1934 was not the same as the handwriting of the name "Margaret Dempsey" on the agreement *282 of December 29, 1934. The agreement of December 29, 1934 was left by Johnson with Tomaso for the signature of Margaret Dempsey. Johnson did not known who signed that name. On April 1, 1937, an extension agreement was entered into between the Johnsons and the bondholders of the Eastgate Apartment Bonds. Fred A. Johnson left this agreement with Tomaso to obtain the signatures of Margaret Dempsey, Marie Moore and John Roach, and when it was returned to him it had the names of these persons signed thereon as the owners respectively of bonds in the face a mounts of $15,000, $5,000, and $10,000. Tomaso did not know who signed the names "John Roach" and "Marie Moore", although he testified that petitioner signed the name "Margaret Dempsey". Nolan used the fictitious names of "Margaret Dempsey" and "John Roach". Between September 17, 1937 and October 1, 1941, the committee for the bondholders issued nine checks drawn on the Prairie State Bank, payable to "Currency", and countersigned by Johnson. These checks were for payments of interest on Eastgate Apartment Bonds, and were delivered by Johnson to Tomaso in exchange for interest coupons on the Eastgate Apartment Bonds. One of these checks, *283 dated September 17, 1937, and for $750, was for interest at 2 1/2 percent for six months on $30,000 full value of Eastgate Apartment Bonds in the names of Margaret Dempsey, Marie Moore and John Roach. These nine checks were issued about six months apart and the $750 check above was the first for bond interest falling due after Nolan's death. After the issuance of this one check the semi-annual bond interest of all the Eastgate Apartment Bondholders totaling $1,325 was included in one check and delivered to Tomaso. At the time of his death Nolan was the beneficial owner of these bonds. $10,000 Par Value Belporte Apartment Bonds On September 28, 1934, an agreement was entered into between the Bondholders of Belporte Apartment Bonds, Fred A. Johnson, Ella L. Johnson, and the Prairie State Bank of Oak Park. This agreement bears the names of numerous bondholders including that of "Margaret Dempsey" as representing Belporte Apartment Bonds, numbers 99 to 118, inclusive, in the amount of $10,000. Fred A. Johnson left this agreement with Salvatore P. Tomaso to obtain the signature of "Margaret Dempsey". On March 18, 1936, a check in the amount of $200 was drawn on the Prairie State *284 Bank by the Bondholders Committee of the Belporte Apartment Bonds and made payable to Tomaso. This check was a payment of interest in the amount of 2 percent per annum on $10,000 of Belporte Apartment Bonds, and was made payable to Tomaso because he was acting as agent for an unknown owner of bonds in that amount of face value. It contains the following endorsements: S. P. Tomaso, M. Dempsey and East Fontenelle Apts. On the day of issuance of this $200 check Tomaso made a deposit slip for the account of Nolan for $200 and made the notation "Bel" in the bottom left-hand corner. At the time of his death Nolan was the owner of these bonds. Eden Apartment Bonds (par value $35,000) On September 1, 1932, an extension agreement was entered into between Glenn P. Eden, Marjory Eden and the bondholders of the Eden Apartment Bonds. The agreement contained the names of numerous bondholders including that of John Hill, Danville, Illinois, as representing Eden Apartment Bonds, serial numbers 21 to 50 in the amount of $15,000, and that of Geo. Peterson, Danville, Ill., as representing Eden Apartment Bonds, serial numbers, 51 to 90, in the amount of $20,000. The serial numbers of these bonds *285 are identical with the serial numbers of the Eden Apartment Bonds purchased by Nolan, about June 30, 1927, as above set out. Salvatore P. Tomaso signed the name "John Hill" to the above extension agreement for the Eden Apartment Bonds. Edward J. McCue signed the name of "George Peterson". On November 12, 1934, as a result of a conversation with Tomaso, one Milton Hart, an attorney who did know John Hill or George Peterson, prepared a letter for the signature of Hill and Peterson, addressed to his law firm of Hart and Shomberg. He mailed this letter to Tomaso for their signature and Tomaso signed the name "John Hill" to this letter and after having someone else write the name "George Peterson" thereon, he mailed it to the firm of Hart and Shomberg. The pertinent parts of this letter read as follows: Danville, Illinois. November 12th, 1934. Gentlemen: We are advised by Mr. S. P. Tomaso, who attended the bondholders meeting on the Eden Building held at your office, at which meeting he represented us, that you filed the bill to foreclose this bond issue, the suit being brought in the name of Josephine Herrmann, in the Circuit Court and is a representative suit for all the bondholders. *286 We are the owners and holders of $35,000.00 worth of the bonds of this issue and feel that on account of being the owners of 70% of the issue that we should be made parties plaintiff in the suit with Josephine Herrmann. * * * * *
If you can not act for us, kindly advise us at once so that we can consult another attorney. Very truly yours, John Hill Geo. Peterson P.S. The bonds owned by us are as follows: John Hill, #21, to 50 both inclusive, $15,000. George Peterson, #51 to 90 both inclusive, $20,000. This letter was prepared and signed after the death of Edward J. McCue. The petitioner had no business transactions with the attorneys, Hart and Shomberg, did not know who signed the names "John Hill" and "George Peterson" on this letter, and never heard of these names. On November 16, 1938, after Nolan's death, the Eden Apartment Building was sold, and an escrow fund was deposited with the Chicago Title & Trust Company for the purchase of the Eden Apartment Bonds. Voucher checks requiring a receipt to be signed on their face were issued by the Chicago Title & Trust Company on that day and made payable to "John Hill" in the sum of $9,000 for Eden Apartment Bonds Nos. *287 21 to 50, inclusive, and to "George Peterson" in the sum of $12,000 for Nos. 51 to 90, inclusive. Tomaso signed the name "John Hill" on the face of the voucher check payable to "John Hill" as a receipt, and also endorsed the name of "John Hill" on the check. John McCue, a son of the petitioner, Agnes McCue, signed the name of "George Peterson" on the voucher check payable to "George Peterson" in the sum of $12,000, as a result of this transaction, but did not know anything about the $12,000. The petitioner received about $20,000 from the sale of the $35,000 in Eden Apartment Bonds in 1938, but she had no knowledge of who signed the names "John Hill" and "George Peterson" on the voucher checks. At the time of his death Nolan was the beneficial owner of these bonds. $32,000 St. Anne Apartment 6 1/2 Percent Bearer Bonds On December 29, 1932, Joseph Kahn and Sarah Kahn, by a quitclaim deed conveyed to "George Lorenz" the real estate known as the St. Anne Apartment Building which secured the St. Anne Bonds purchased by Nolan in 1927. A number of these bonds stood in the name of George Lorenz. George Lorenz was related to Nolan and worked for him in the year 1932, but Lorenz never *288 claimed that he owned any interest in the Apartment Building. Nolan informed his daughter, Marcella Beerly, that he had purchased the St. Anne Apartment Building. On July 14, 1937, within a month after Nolan's death, Julius H. Miner, a Master in Chancery of the Circuit Court of Cook County, Illinois, pursuant to a decree entered by that court on July 24, 1933, sold the mortgaged parcel to the petitioner, Agnes McCue, under the fictitious name of "Marie Kelly" for a bid price of $11,500 which consisted of cash and St. Anne Apartment Bonds, serial numbers 17 to 80, inclusive. Serial Nos. 17 to 66, inclusive, presented as part of the purchase price were identical with the serial numbers of the St. Anne Apartment Bonds purchased by Nolan, as above described. On March 14, 1938, the petitioner, Agnes McCue, under the fictitious name of "Marie Kelly", without the knowledge or consent of George Lorenz, acknowledged before a Notary Public that Lorenz had on that day paid her the full amount which she had bid for the St. Anne Apartment Building, together with all lawful interest, costs, charges, taxes and assessments due, owing or accrued thereon, and that Lorenz duly redeemed the real estate *289 according to law, and that the Certificate of sale she received from the Master in Chancery was null and void. On April 19, 1938, after Nolan's death, Agnes McCue, without the knowledge or consent of George Lorenz, had her son, John McCue, appear before a Notary Public and pretend he was George Lorenz, bachelor, and sign the name "George Lorenz" to a quitclaim deed, conveying the St. Anne Apartment Building to her under the fictitious name of "Mary Crummie", spinster. At the time of his death Nolan was the beneficial owner of these bonds. $11,000 Capitol Theatre Bearer Bonds Held in the Name of "Joseph Newman" 1319 S. Kenilworth Avenue, Berwyn, Illinois On May 13, 1933, an escrow receipt was issued by the Chicago Title & Trust Company, Escrow Agent, stating that it had received from Joseph Newman, 1319 S. Kenilworth Avenue, Berwyn, Illinois, National Theatres Corporation Capitol Theatre Building Real Estate Serial Gold Bonds dated August 20, 1923, issued under trust deed to Chicago Title & Trust Company, dated August 20, 1923. The bonds are described in the escrow receipt as follows: Number
Denomination
823, 995, 1249, 1331,
1530, 1531, 1719 to
1745 both inclusive
and 1765
$ 100.00 each
2860, 2865 and 2885
500.00 each
3080, 3084, 3088,
3226, 3240 and
3248
1,000.00 each - Agg. $11,000
*290 The escrow receipt bears a written notation over the name of Joseph Newman stating that they were received by Newman on August 9, 1933, and the letter "N" in the name Joseph Newman has the same characteristic as the letter "N" used by John J. Nolan in signing his surname. The petitioner never lived at 1319 S. Kenilworth Avenue, Berwyn, Illinois, but Nolan used the name "Joseph Newman", and gave his address as 1319 South Kenilworth Avenue, Berwyn, Illinois, on his income tax return for the year 1932. The loan security record of the Prairie State Bank, Oak Park, Ill., stated that Nolan, on December 24, 1934, deposited as security with the bank for a loan Capitol Theatre First Mortgage Building Bonds numbers 1722 to 1745, inclusive, and 1765 at $100 each, aggregating $2,500; numbers 2860, 2865 and 2885 due September 1, 1949, at $500, aggregating $1,500, and numbers 3080, 3084, 3088, 3226, 3240 and 3248 at $1,000 each, aggregating $6,000. The numbers of these bonds are identical with the numbers of the bonds received in escrow from "Joseph Newman" by the Chicago Title & Trust Company on May 13, 1933, and returned to a "Joseph Newman" on August 9, 1933. These bonds were withdrawn from *291 securities deposited at the Prairie State Bank by Nolan on March 2, 1937. Between April 11, 1935, and March 9, 1936, Nolan received $500 in interest on the above $10,000 in Capitol Theatre Bonds pledged with the Prairie State Bank and Salvatore P. Tomaso, an officer of the bank, deposited this interest in Nolan's account. At the time of his death Nolan was the beneficial owner of these bonds. $156,000 Par Value Kankakee Beverage Company 6 Percent First Mortgage Bearer Bonds Nolan was president of the Kankakee Beverage Company of which he owned 85% or 90% of the common stock. On December 31, 1936, he received $156,000 in par value Kankakee Beverage Company 6 percent First Mortgage Bearer Bonds from the Company in exchange for advances made by him to it in the sum of $155,962.73. The advances were made subsequent to 1933 for the purpose of putting the brewery into operating condition. To evidence some of these advances Nolan caused the Beverage Company to issue notes payable to Agnes McCue. The bonds issued to him in 1936 were intended to be in substitution and exchange for all such notes and as evidence of the indebtedness created by the advances not evidenced by notes. The notes *292 were made payable to Agnes McCue pursuant to Nolan's practice of keeping all of his assets in names other than his own. These bonds were part of an issue of $178,000 in this class of bonds by the Kankakee Beverage Company. The Kankakee Beverage Company is at Kankakee, Ill., on Illinois Highway No. 54, which is the main thoroughfare between Champaign and Chicago. In the year 1937, the property of the Kankakee Beverage Company, and consequently its bonds also had a net value of $20,000. Nolan having received $156,000 in these bonds out of an issue of $178,000, the value of his bonds in 1937 would be 156-178th of $20,000, or approximately $17,526. These bonds were not given by him to petitioner. At the time of Nolan's death he was the beneficial owner thereof and they are properly includible in his gross estate. Dwelling House at 1045 North Park Ave., River Forest, Ill. The lot upon which this residence is located was deeded on June 28, 1928 by the then owners, named Buurmas, to Edward McCue and Agnes McCue as joint tenants. The purchase price was approximately $20,000 and was paid by Edward McCue. Thereafter Joseph Guethlein, a contractor, constructed on this lot a nine-room house *293 and a three-car garage at a cost of approximately $44,000. He was employed to do this by Edward McCue, and before and during the construction he had frequent consultations with Agnes McCue with regard to details of the plans. During the construction of the house he rendered monthly statements covering the cost to Edward McCue who paid him either by check or cash. The contractor had no dealings with Nolan and at the time he built this house he did not know Nolan. The house was completed in 1929 and was occupied by Edward and Agnes McCue and their children until Edward's death in 1934, and thereafter by Agnes, the surviving joint tenant and her son, John. Nolan frequently stayed at this house. In a safe located here he kept cash, securities and other papers. He used the house as a business headquarters when he was in Chicago. Two of his daughters lived here occasionally with the McCues. He was in this house during his last illness and died there. On December 20, 1937, about six months after Nolan's death, the petitioner, through her cousin and attorney, Andrew D. Jordan, had a pretended mortgage in the amount of $25,000 placed upon this property and had this mortgage recorded. The *294 mortgage was security for the payment of bearer notes which she herself held. The decedent, John J. Nolan, was not the beneficial owner of this property at the time of his death, or at any other time. Improved Real Estate at 4110 Armitage Avenue, Chicago, Ill. During 1928 and 1929, Joseph Sykora owned and operated a tavern located at 4110 Armitage Ave., Chicago, and purchased beer from Nolan. Edward J. McCue frequently visited Sykora's place of business and collected the purchase price of this beer for Nolan. In 1929, when McCue was making such collections, Sykora asked him for a loan of $6,000, with which to pay a second mortgage upon this property which was coming due. About two weeks later Joseph Sykora went with McCue to a bank in Chicago, Ill. Sykora waited outside of the bank, McCue went inside and came out with $6,000 which he gave to Sykora who thereupon executed a second mortgage of the real estate in which McCue was named as mortgagee. In 1931 the first mortgage became due and Sykora was unable to pay it. He thereupon consulted McCue and it was agreed that Sykora should cause the property to be conveyed to McCue subject to the first mortgage with Sykora having the right *295 to "redeem" the property within one year. A conveyance was accordingly made of this parcel by the Cicero Trust and Savings Bank as Trustee to "Edward J. McCue" at Berwyn, Ill., the deed being dated February 24, 1931. The first instalment tax notice for local taxes in the year 1935 was made out to "E. J. McCue", 1319 S. Kenilworth Ave., Berwyn, Illinois. Edward J. and Agnes McCue never lived at this address but Nolan gave this as his address in his income tax return for the year 1932, and in his escrow receipt for the above-mentioned Capitol Theatre Bonds. In 1935, after McCue's death, petitioner and her son, John McCue, signed an extension agreement whereby they assumed personal liability on the indebtedness secured by the first mortgage. At the time of his death Nolan was not the beneficial owner of this property. Commercial Brick Building, 7216-18 Circle Ave., River Forest, Illinois, Lot, 7238 Circle Avenue, River Forest, Illinois, Garage Building, 3437-39 S. Hermitage Avenue, Chicago, Ill. 6 Room Brick Bungalow, 5623-25-27 S. Paulina Ave., Chicago, Ill. Theatre and Building at 25 Cass St., Westmont, Du Page County, Ill. Commercial Frame Store Building at S. W. Corner of Oakwood *296 and Haas Avenue, Lyons, Cook County, Illinois. Before May 19, 1937, Nolan was the owner of the above-described real estate, the record titles of which were in fictitious names. On May 19, 1937, Nolan was confined in bed at the house located at 1045 N. Park Ave., River Forest, Ill., in which petitioner and her son were then living. He was and had been attended by a physician and from May 20 to the time of his death, was cared for by a trained nurse, who was employed on the recommendation of the physician made to petitioner several days before May 20. On May 19 and May 20, 1937, Nolan conveyed these premises by quitclaim deeds to petitioner. The physical condition of Nolan became steadily worse from several weeks before May 19 until his death on June 29, 1937. A priest was called in to visit Nolan a few days after he was confined to his bed, and made known to his daughter, Charlotte Nolan, her father's illness. The priest visited him nearly every day until his death. The petitioner, on May 22, 1937, informed Charlotte Nolan that he had been so ill that no one could see him. He was irrational at times during his illness. He was suffering from cirrhosis of the liver, nephritis, cardiorenal *297 syndrome and chronic arthritis. The death certificate stated that death was caused by congestive heart failure with uremia. During his last illness, which lasted for several weeks, Nolan was at times too weak to be able to write in a normal manner. He signed the quitclaim deeds dated May 19 and 20, 1937, and purporting to convey certain real estate to the petitioner. He did not sign, on June 24, 1937, the income tax return of John Nolan for the year 1936 purportedly signed by him on that date before John McCue as notary public. The conveyances evidenced by the quitclaim deeds above referred to were transfers made by Nolan in contemplation of death and were not bona fide sales for a fair consideration. 100 Shares of Food Machinery Corporation $100 Par Value Common Stock The 100 shares of Food Machinery stock emanated from 200 shares of Sprague Sells Corporation Class A Stock owned by Nolan and issued March 17, 1926. On July 22, 1927, Nolan transferred these 200 shares of Sprague Sells Corporation stock to the name of "Joseph Donnelly, 5023 Maypole Avenue, Chicago, Illinois". Nolan became separated from his wife on July 8, 1927, and was living at this address at the time of the *298 transfer. A receipt for the certificate of deposit of this stock, dated December 1, 1928, was signed "Joseph Donnelly, 5043 W. Adams Street." The petitioner never lived at this address. The 100 shares of the Food Machinery Corporation stock was in the name of "Joseph Donnelly" after October 31, 1934, the day of death of Edward J. McCue. Petitioner sent them to the Food Machinery Corporation and had new stock issued in her name on or about February 27, 1936, but she does not know who signed the name of "Joseph Donnelly" for the transfer of the stock. At the time of his death Nolan was the beneficial owner of this stock. 100 Shares Union Carbide & Carbon Common Stock; 100 Shares Houdaille-Hershey Class B Stock; 100 Shares Borg-Warner Corporation, $5.00 Par Common Stock; 12 Shares Atlas Corporation, 6 Percent Preferred Stock; 63 Shares Atlas Corporation Stock; 100 Shares Advance Aluminum Casting Corporation Stock. The above-described stock was purchased by Edward J. McCue and was held in his name until the time of his death, when they were found among his papers by petitioner. All these stocks, including the Food Machinery Corporation stock, had an aggregate stipulated value on June 29, 1937, of *299 $23,126. The petitioner had no knowledge of this stock until after her husband's death on October 31, 1934. She did not probate his estate or file an inheritance tax return with the State of Illinois. Medical and Funeral Expenses The petitioner paid $1,243.93 for the funeral expenses of Nolan and about two years after his death she paid the sum of $225 for medical services rendered during his last illness after the physician informed her that he was going to present the matter to his attorneys and file a claim against the estate of John J. Nolan. Income Tax Liability of Petitioner for 1937 The evidence does not prove that petitioner in 1937 omitted over 25 percent from her gross income as reported by her for that year, or that she filed a false or fraudulent return of her income for 1937. Income Tax Liability of Petitioner for 1938 In 1938 petitioner received the sum of $1,681.40 as "redemption period net income" upon the termination of foreclosure proceedings involving the St. Anne Apartment building distributed pursuant to an order of the court administering this proceeding. Opinion KERN, Judge: At the outset of this opinion we can not refrain from pointing out *300 the difficulties which we encountered in a consideration of these cases. The transcript of evidence taken at the hearing contained 1529 pages. Almost 200 exhibits were introduced. Depositions of five witnesses were submitted having a total of over 200 pages. At the hearing 43 witnesses testified. These statistics however only hint at the difficulties inherent in these cases. They involve the tax liability of petitioner in three different capacities, as statutory executrix (or custodian) and transferee, for estate taxes, and in her individual capacity, for income taxes. In one of the cases in which the determination of deficiency was against petitioner as custodian-statutory executrix, the daughter of decedent who has twice served as administratrix of his estate was permitted to intervene and was represented by counsel at the hearing. The ownership of some twenty-five items of property must be determined as of June 29, 1937. In connection with the tracing of title to these properties, we have found in the record approximately fifty fictitious names or aliases, some of which were used by more than one person. It was the exception rather than the rule when any of the persons dealing *301 with these properties used his or her right name. The transactions involving these properties, into which we are forced to inquire, occurred many years before the hearing, and consequently some of the records which might have been helpful in explaining them have been lost and witnesses whose testimony might have been helpful have died or their memory has been clouded by time. However, the worst impediments to a clear understanding of the transactions involving these properties are the fact that they appear to have been conceived and carried through for the primary purpose of concealing the true ownership of the properties, and the further fact that few of the principal witnesses who testified gave evidence which, in the opinion of the Judge presiding at the hearing, could be relied upon with any degree of confidence. The two daughters of Nolan who testified at the hearing and his former wife, now Josephine Taglia, who testified by deposition, were obviously consumed by a vicious venemous hatred of petitioner. The daughters were also interested parties in that their hopes of inheritance depend upon an ultimate determination that their father Nolan was the beneficial owner of the property *302 in the possession of their aunt, the petitioner. The former wife of Nolan appears by her deposition to be an hysterical type of female, more interested in vilifying her real or supposed enemies than in contributing to the judicial discovery of the truth. The daughter, who is at present administratrix of Nolan's estate and intervenor herein, impressed the Judge hearing her testimony as having inhereited to some extent the characteristics of her mother. The banker, Tomaso, gave testimony which is much relied upon by petitioner. Upon the witness stand he was both smart and smooth, but we are not convinced that his testimony was candid, unbiased or a full disclosure of the true facts. We are unwilling to rely upon the testimony of a banker who cooperated so completely with a notorious bootlegger during the Prohibition era in concealing his wealth by the use of aliases and other legal subterfuges at a time when any reasonably prudent banker should have known that such concealment was intended as a means of evading the payment of Federal income taxes, or of preventing punishment for a Federal crime, or of facilitating the carrying on of an illegal business. His complacency in the use of *303 false names in business transactions, even to the extent of signing them occasionally himself indicates a sense of business ethics which throws a shadow upon his entire testimony. At the time of the hearing he was financial advisor to the petitioner. His former customer or client Nolan, was long since dead. His interest would therefore bias him in favor of petitioner. The petitioner herself testified with moderation and restraint. However, her testimony was so improbable in the light of the known facts, her conduct was so inexplicable by any standard of ordinary business behavior, and so inadequately explained by the evidence before us, and her version of transactions so startlingly devoid of the normal expected confirmations, that we are forced to disbelieve her testimony in a large part. Several other witnesses called by petitioner and respondent, including John McCue, Andrew D. Jordan, John F. Higgins, and Louis Nies, gave evidence which, in our opinion, is in greater or lesser part unreliable. Having given a frank appraisal of some of the principal witnesses, it is appropriate at this point to consider motions of petitioner to strike certain parts of the testimony from the *304 record which were taken under advisement at the time of the hearing. The first motion was to strike out, as hearsay, evidence as to statements made by the decedent Nolan tending to establish his ownership of the properties here involved. At no time pertinent to these proceedings was Nolan free from fear that property owned by him would be discovered and levied upon by Treasury agents for the satisfaction of the considerable tax liabilities which were asserted or might be asserted against him. This is apparent from his almost universal practice of secreting his ownership of property by the use of false names and other devices. During a part of the time he was engaged in litigation with his wife, which would have made it disadvantageous to him to have his ownership of property known. Accordingly we are of the opinion that under the peculiar facts of this proceeding any declarations or admissions on his part which would tend to establish his ownership of property are to be considered as against the interest of decedent, and therefore admissible in evidence. ; . See also Wigmore *305 on Evidence, 3rd Edition, 1940, § 1463. Petitioner's motion to strike out such evidence is denied. The second motion was to strike the testimony of Higgins, a lawyer, as to matters ascertained by Higgins from conversations with Nolan who had on occasion been his client. See , reversing . We grant this motion except as to that testimony of Higgins which establishes our finding that Nolan, on one occasion, gave him $7,800 for use in a real estate transactions and that Higgins returned this money to Nolan with the latter's knowledge and consent by means of a check in the amount of $7,800 payable to Edward McCue. See 28 Ruling Case Law, p. 563, and cases cited. Petitioner's motion to strike the testimony of respondent's witness Beatrice Greenberg to the effect that on an occasion her deceased husband was acting as attorney for Nolan is denied. This testimony, while not as definite and decisive on this point as we would like, is, in our opinion, admissible since it was knowledge coming to her from her own senses. We turn now to a statement as to the issues involved in these proceedings and a consideration *306 of the evidence which has led us to the conclusions which we have made. In No. 233 respondent has determined a liability of $55,346.49 for estate taxes on the estate of John J. Nolan who died June 25, 1937, against petitioner in her capacity as transferee of the estate. To this was added a 25 percent penalty for the failure to file a return of $13,836.62. In Docket No. 234, a determination in the same amount is made against petitioner as custodian (statutory executrix) of Nolan's estate. The basis for the determination in each case is that Nolan at the time of his death was the real or beneficial owner of many separate items of property. However, in determining the decedent's gross estate, respondent has included certain property transferred to petitioner by deeds purportedly executed by the decedent within 30 days of his death. On brief respondent contends that these deeds were forged or were made in contemplation of death. In Docket No. 315, respondent determined a deficiency in petitioner's income taxes for the year 1937 in the sum of $189,839, plus a 50 percent fraud penalty of $94,919.50, plus interest, which was based on an increase in petitioner's income for that year, which *307 was the year of Nolan's death, of $336,137.39. This sum represents the aggregate value of 20 separate assets which are said to have been acquired by petitioner so as to constitute taxable income to her under section 22(a), Revenue Act of 1936; by her converting them to her own use in that year from Nolan's estate and failing to report them in income, an omission alleged to exceed 25 percent of the amount of gross income stated in her 1937 return. He also determined a deficiency in petitioner's income tax for 1938 in the sum of $148.06. In the two estate tax cases additional deficiencies are asserted in respondent's answers. Before proceeding to a discussion of the evidence pertaining to the several properties involved herein, and the issues as related to them it would be well to state the general factual background in perspective to which the particular transactions must be viewed, even at the risk of repetition. John J. Nolan, the decedent, died in Cook County, Ill., on June 29, 1937, after an illness of some length. His general physical condition during these last weeks is pertinent and will be considered later. He had been for over a decade before his death a bootlegger and *308 had amassed a considerable fortune in this illegal business. He appears, from an assessment made by the collector of internal revenue for unpaid distilled spirits tax, to have been associated with such "big shots", to employ the jargon of the age, as Al Capone. In a bitterly contested divorce action, he divorced one wife (or she divorced him, the evidence is not certain nor the fact significant), lived in adultery for a time with another woman, and in order to hide his property from his estranged wife, to disguise his illegal activities, and to avoid the investigations of agents of the Treasury, he used so many aliases and assumed so many names that it was difficult then, and more difficult now, to follow his movements, and to trace his spoor from investment to investment and from bank to bank. Considering the background of his life, his business and his era, it is no surprise to find Nolan's path strewn with fraud, deceit, concealment, perjury, subornation, fictitious names, and fraudulent conveyances. Nolan died, it has been said, on June 29, 1937, and the investigating revenue agents found only a small amount of property still in his name. His daughter, Marcella, was appointed *309 administratrix on July 7, 1937, but 3 years later (November 18, 1940), having abandoned the job of finding his estate, she was removed as administratrix and the estate was closed. On December 13, 1943 the Probate Court revived her letters of administration, and she appears here now in the estate proceeding as intervenor and a party in interest. Nolan's wife, later remarried, testified in this proceeding and from her testimony we learn many of his personal traits of thought and habit. His sister appears as the petitioner in the respective capacity of alleged transferee and statutory executrix of the estate in two proceedings; and in the other as the petitioner alleging error in respondent's determination of a deficiency in her income tax resulting, it is claimed, from her embezzlement or conversion to her own use of by far the greater part of Nolan's estate. Certainly substantial assets in the form of land (and buildings), stocks and securities have been found in her possession, to which she now claims ownership. The essential question is whether any part of them, and if so, which parts were, in truth, property beneficially owned by Nolan at the time of his death and were misappropriated *310 by petitioner to her own individual use in 1937. The evidence on each of the parcels will be considered separately since any other form of discussion would serve only to confound further the confusion of stories which each party advances. The respondent pictures the petitioner as a person employing fraud, forgery, false conveyances and false court proceedings, and, in short, any other convenient device to secure possession of Nolan's estate and the semblance of title. The counsel for the intervenor is hardly more flattering, for she is represented by him as a Termagant seeking to defraud Nolan's children of their inheritance. On the other hand, petitioner's counsel show us a resourceful, careful business woman capable of looking after her own business by investing carefully the gifts from her brother, the decedent, and so multiplying their value; as the recipient of gifts of untold origin from her husband; and altogether as an orderly, placid housewife whose moral rectitude and remoteness from the wickedness of this world, except such as was unwillingly forced upon her by association with her brother or husband, might be imputed to the ladies of "Cranford". Naturally, the petitioner's *311 real portrait has been painted by no one of our three artists. The last of the important actors in this drama is Edward McCue, petitioner's husband, who died on October 31, 1934. He had been employed by his brother-in-law, Nolan, on a full-time basis as a beer salesman and collector since about May 7, 1927 until his death, and before that had been an employee of the Pennsylvania Railroad, and later of the Monon Railroad at modest salaries ranging from $55 to $146 a month. However, his widow, the petitioner, had little knowledge, according to her testimony, of the nature of his employment after he stopped working for the railroad, although they lived amicably together until his death. During these latter years, she says, he made her mysterious presents of bundles of bonds and other securities. She did not know how, when or why he acquired them, and admitted that so far as she knew, he might have stolen them. A lesser role, but one intimately involved with those of the principal actors, is played by Tomaso, an officer of the Madison Square State Bank, and later an officer of the Prairie State Bank of Chicago, with both of which Nolan had frequent dealings, whose testimony at the hearing *312 we have already discussed. These are the principal players, but numerous small lawyers, notaries public and cousins of the petitioner appear from time to time on the stage. Having set forth the general issues and given some picture of the relation of the main actors, we shall proceed to consider each transaction as it arose, taking it in the order set out in our findings. 1. Tavern at 8107-8109 Ogden Ave., Lyons, Ill. The evidence is that Nolan bought this parcel in 1928 intending to have a tavern run there. The title appeared to have been taken in petitioner's name. In the summer of 1928 Nolan employed one Huisinga to operate the place, telling him that it was his, Nolan's, property. Huisinga continued to operate it, selling beer which he got from Nolan, till early in 1930. Neither the vendor of the property nor Huisinga knew anything of petitioner, and Huisinga, although he had known McCue before 1928, never had any transactions with him before 1930. In 1934 Nolan employed Metz to build an insulated cooler-room at the back of the tavern for storing beer. Nolan laid out the method of construction. Edward McCue was then, however, about the place all the time, for he had been *313 hired, as receipts in evidence show, to collect for beer sold. Metz was not paid for his work, and learning that the tavern was in petitioner's name, filed suit against her to foreclose his mechanic's lien, and bought the tavern on foreclosure on September 2, 1936. Petitioner exercised redemption in the round-about way of confessing judgment on a pretended promissory note made by her shortly after Nolan's death to Jordan, a lawyer cousin, to whom, as a judgment creditor, Metz on September 28, 1937, after Nolan's death, it will again be noted, assigned his foreclosure certificate of sale, presumably after having had his lien satisfied. Jordan, in turn, obtained a master's deed and reconveyed to petitioner. Such is the evidence. Respondent has made a determination, including this parcel in decedent's gross estate. The burden rests on petitioner to show that respondent erred in doing so. She has given no satisfactory explanation of how or when the parcel came into her possession or ownership. On the other hand, the record reeks with the evasive methods of Nolan in using other persons' names, both real and fictitious, in which to put his property for the purpose of evading the payment *314 of taxes and avoiding the demands of his estranged wife. The evidence convinces us that Nolan bought the parcel in 1928 and continued to exercise his dominion over it through the period of Metz's addition. At best, McCue appears only as an agent of Nolan in the collections for beer sold on the premises, and no claim is made that he owned the place. Petitioner appears not at all until Metz acquired his lien which he enforced in September, 1936, when Nolan was probably already a sick man. Only after Nolan's death did petitioner take steps to reacquire title in the way stated, but no explanation is given why she allowed her period of redemption as record owner to run and had to create a pretended judgment creditor's right to save her remedy. Her interest in redemption, it will be noted, arose after the death of Nolan, although it was then more difficult. In all these circumstances, we think that Nolan was the equitable owner of the tract at the time of his death; and that petitioner has failed to overcome the presumptive correctness of respondent's determination to that effect. 2. Real Estate Bonds On or about June 30, 1927, Nolan the bootlegger, having prospered at his new trade, *315 walked into the Madison Square State Bank in Chicago to invest $300,000. He was accompanied by his general factotum, McCue. Nolan wished to buy Government bonds and talked with Clarence E. Stimming, a Vice President of the Bank, who told him the bank could not sell him that much. Stimming talked with the president of the bank who suggested that Nolan be persuaded to buy real estate bonds. Stimming talked further with Nolan and he agreed to take the bonds of that type. This much is clear on the evidence of Stimming. The records of the bank show that 3 lots of real estate bearer bonds were sold on that day for a total sum of $305,011.31, each of which was entered under a different name, one to "George Ferguson", another to "James Horner", and the third to "Joseph Sullivan". Only the last two lots are involved in the case before us. So large a sale was very unusual in the bank and attracted the general attention of the employees as well as of the responsible officers, such as the Vice President Stimming. Nolan had told Stimming that he wished the sales to be recorded as made to others than himself. Stimming did not actually receive any money from Nolan nor see it pass, but he understood *316 later that the sale discussed had been consummated and the records show such a sale. He also understood that the money was paid by Nolan in cashier's checks issued to him, but he did not see the checks. Stimming was testifying, of course, 17 years after the event as to facts which by reason of their unusual character at the time were common talk among the bank's employees and of especial concern to the bank's officers. Beyond question the bonds sold at this time, or certain of them, were identified by number as those in possession of petitioner after Nolan's death, or as used in the acquisition of properties in her possession after his death. And clearly, also, some $300,000 worth of bonds were sold and paid for at the time, as the bank records show by the phrase "credit checks". On May 21, 1928, nearly a year after Nolan's purchase, new entries were made in the bank records showing a repurchase and resale to other persons of two lots of these bonds, those sold to "James Horner" and to "Joseph Sullivan". The witness Rohm, head of the bank's real estate loan department in June 1927 and later vice-president, testified that these were "wash" sales. He explained the new sale as "wash" *317 by saying that that meant taking the bonds out of one name and putting them in another. In view of this testimony and in the absence of any in contradiction, we are of the opinion that Nolan bought the bonds and that a "wash sale" of them occurred by which he split up his holdings several times again. The numbers, it will be remembered, of many of the bonds in the possession of petitioner correspond with those of the bonds sold to Nolan by the bank. This conclusion is supported and corroborated by the evidence of Nies, a contractor, who had had dealings with Nolan and who testified that he had conferred with Nolan's bank on Nolan's credit and his own bank had gotten $20,000 in bonds as security for a deal. He also testified that Nolan had told him that he had had to put all his property under different names. Josephine Taglia, Nolan's divorced wife was able to remember a considerable number of these fictitious names used on occasion by her husband. She remembered Foster, John Novak, George Ferguson, John or Joseph Sullivan, Joseph Cleary, John Henderson, George Rafferty, John Cronin, Frank Lorenz, James Anderson, Reid, John Beall and James Rush and Sam Greenberg, and several others *318 including John Quick. But many others suggested by respondent's counsel, including "James Horner" had escaped her memory. Nolan had a little book, she said, in which he entered the fictitious names which he used. In view of all these facts we must conclude that decedent John Nolan was at all times the beneficial owner of these two parcels of bonds, and the real estate into which some of them were converted. Petitioner's testimony and contentions with regard to these bonds, their acquisition and use, will be set out and discussed under the next issue which immediately follows. 3. Apartment House at 1100-1104 N. Lawler Ave., Chicago In 1931 the Pioneer Trust and Savings Bank executed a trustee's deed to "John F. Quick" to the Lawler Avenue apartment house. The Lawler Apartment bonds bought by Nolan as part of his $300,000 purchase in 1927 under several pseudonyms, as already described, were issued on this realty. It may be inferred that by reason of his ownership of these bonds Nolan, who had listed as one of his fictitious names "John Quick", became the successful bidder at the foreclosure sale and so acquired the parcel in that name. We shall refer to these bonds later in *319 examining petitioner's testimony. In 1934 Nolan asked Albert B. Schweinsberg to lend him $15,000 on this apartment house to be secured by a first mortgage. Schweinsberg brought in Hugo Dalmar, both of whom discussed the matter with Nolan, as Schweinsberg testified, and the loan was made. When the mortgage papers were signed, however, it was not by Nolan, but by a stranger to Schweinsberg, who purported to be the titleholder, "John F. Quick" Schweinsberg some six months later saw this man dead on his bier and recognized the pseudonymous Quick. The body was that of Edward McCue, petitioner's husband. Nolan and "Quick" duly endorsed the check received on the loan and it was deposited to Nolan's credit in the Prairie State Bank at Oak Park, Ill. About a month after Quick-McCue's death Schweinsberg asked Nolan why McCue used the pseudonym, but received only the assurance that he needn't worry, the mortgage would be paid. The occasion when the idea of using the name, "John F. Quick", first occurred to Nolan was one which Nolan's wife remembered with peculiar distinctness, for he stood by the kitchen table and quoted the old nursery rhyme, about "Jack be nimble, Jack be quick", and told *320 her to put down this new "alias" in his little black book of aliases. Now, petitioner's testimony is that it was she and not Nolan who held the bonds on the Lawler Apartment house. She testified that her husband, concerning whose business affairs she knew nothing, came to her in 1931 with a stack of bonds two feet high which she had never seen or heard of before, gave them to her and asked her to work out those bonds which were in default since he had no money. It is not explained why her husband, who only two years before had money with which to purchase a $60,000 home, suddenly had no money, although his employment was still in a lucrative illegal business, or why he would depend on a housewife with no previous business experience to negotiate intricate real estate reorganizations. Nor is it explained how these bonds came into McCue's ownership. With regard to the particular bond issue she testified the matter needing to be "straightened out", she looked to her husband as a person better able to do the job than she was, but she "did not want it in his name, because it was not his, and that is why he used that name" [i.e. "Quick"]. We do not believe petitioner's testimony. If *321 she and not Nolan used one of Nolan's fictitious names in the "straightening out" of this property, and paid out money in the process, she was, in our opinion, acting for Nolan with his knowledge and using money entrusted to her by him for this purpose, or was using his alias and money without his knowledge for the purpose of defrauding him or his heirs. It is more likely that petitioner used Nolan's alias and money during his life time with his knowledge and consent, acting on his behalf for the purpose of reorganizing and managing this property in such a way as to prevent agents of the Federal government from determining that it was his, and then when his death occurred or seemed imminent, she continued to use his alias and to hold this property. In July, 1935, a check for $9,000, payable to "Mary Mulcare" (a name which appears in connection with the property next discussed) was cashed at the Prairie Bank and on the same day a cashier's check for $5,042, payable to the First National Bank of Chicago (which at that time held the notes and mortgage originally executed by "Quick") was bought at the Prairie and signed by Tomaso, assistant cashier. The First National credited Prairie's *322 check as a payment on the $15,000 Lawler Avenue apartments mortgage. A year later, in July 1936, Nolan under the name of "Charlotte Nolan", the name of one of his daughters, who testified that it was done without her knowledge or consent, got a loan of $5,521.21 from the Prairie, and on the same day, as shown by the Bank's register, a cashier's check for $2,516.04, payable to First National, was bought with the loan proceeds. Nolan then made a payment with this check on the "Quick" mortgage. Petitioner admitted this payment. Who paid the second half of the mortgage does not appear, but the bank records show that it was fully paid by July 1, 1939, two years after Nolan's death. The evidence is conflicting on the identity of "Mary Mulcare". Nolan's wife testified that this was one of his pseudonyms. Petitioner swore that she used the name, borrowed from a relative, but she did not make clear her necessity for such disguises, beyond the vague one already referred to, of "straightening out" her affairs. On the First National's ledger sheet, the "Quick" mortgage is identified with the Prairie State Bank "c/o S. P. Tomaso," and another address, later canceled, is given as "1319 S. Kenilworth *323 Avenue, Berwyn, Ill.". This happens to be the address given by Nolan in his 1932 Federal income tax return. Petitioner admitted that she had never lived there, and said that Nolan never had either, which makes his use of it on his return the more extraordinary. We pass to the next phase. One Slagle had collected the rents on the Lawler Avenue apartments from some year in the early 30's until the time of the trial of this cause. He did so for one "John F. Quick" whom he did not know, and turned over his collections to Tomaso at the Prairie Bank. Tomaso received the rents, and at least once in 1935, and this is not shown to have been an exceptional instance, deposited them to Nolan's credit and noted "Lawler" on the deposit slip. After Nolan's death, petitioner's son, John, on instruction from her cousin and legal adviser, Jordan, signed "John F. Quick", to a warranty deed to the Lawler Avenue apartments, conveying them to Jordon. Jordan, the new grantee, immediately got a mortgage loan, as owner, of $12,000 from a life insurance company, himself signing the mortgage and notes, and turned over the money to petitioner. He became an accommodation maker of the notes for $12,000 merely *324 to help his cousin in her "straightening out", and received no other pay than his regular monthly fee. Jordan's employment by petitioner began about the time of Nolan's last illness. Jordan, himself, as petitioner testified, was never equity owner. The record leaves unexplained why an owner should find it necessary to procure through her son's forgery of a name not his the vesting of title in a dummy grantee in order to procure a mortgage loan on the parcel. We are told only that this involved method of juggling titles was a part of petitioner's "straightening out" process. We are of the opinion that respondent's determination that this parcel is includible in decedent's estate has not been shown to have been error. We are of the opinion that Nolan bought the Lawler Avenue apartments as he had bought the bonds, and probably as a result of having bought the bonds as already suggested; that he obtained the $15,000 mortgage on the apartment, and that he paid it off in part. He was still treating it as his in July 1936, and he was dead within the year. The payment of rents to Nolan's account confirm this view; and if any doubt existed, it would be further confirmed by petitioner's devious *325 dealings with the parcel after she obtained control. 4. Apartment House at 5033-5041 1/2 Quincy Street, Chicago, Ill. This situation has some resemblance to the last in that it involves an apartment house, known as the "Weber Apartments", of which Nolan had previously bought the bonds under an assumed name, as already set out. On March 1, 1932 two persons named Black conveyed title to "Mary Mulcare, spinster". Nolan, as we have seen, sometimes used the name of "Mary Mulcare". Checks were drawn by the rental agent handling this property to the order of "Mary Mulcare" representing the net collection of rents, some of which Tomaso, Nolan's bank's vice-president, positively identified as endorsed by Nolan in this name. He identified others drawn to the same fictitious payee as endorsed by petitioner. In the foreclosure proceeding, on September 1, 1933, a master's certificate, pursuant to court order issued to Helen Priess, who had presented $35,000 of Weber Apartment bonds to be applied on the purchase price of $19,900. These were the same bonds which Nolan had bought in 1927 and which had been made the subject of a wash sale by the Madison Bank in 1928. Petitioner testified that *326 the Weber bonds were given her by her husband in 1931, but upon this there is no evidence save her unsupported testimony. Petitioner put in evidence three receipts from Louis Greenberg, a lawyer, made out to Edward McCue, the first dated April 11, 1933, acknowledging $3,000 paid as a deposit on a bid of not over $23,000, the parcel "to be bid in the name of Helen Preiss, McCue being the real owner of 70 certificates and interest representing both parties. Bonds deposited in court." The second acknowledged receipt from McCue of $14,025 "to be paid Master Bernstein being balance due on Master sale in Rittenberg and Weber et al. property bought in the name of Helen Preiss." The third dated September 8, 1933, acknowledged receipt of $3,000 "to be applied for services in completing work for obtaining title to property at 5041 Quincy Street to Mary Mulcare * * *". Another receipt, dated December 5, 1936, signed by Greenberg, was made to "Mary Mulcare" for $100, "being balance due for all services rendered * * *". It must be borne in mind that Edward McCue was not only petitioner's husband but was also the business agent and general factotum of decedent, Nolan. The next step was the redemption *327 from Preiss for $19,900 in the name of "Mary Mulcare". This took place on September 9, 1933. Greenberg died in 1939. His wife testified that she was present at a conference in her own house between Greenberg and Preiss, at which Greenberg told Preiss that he needed a signature in a real estate matter, and that there was nothing wrong about it. In this single matter, Greenberg's wife said, her husband represented Nolan. She heard Nolan's name over the telephone. Greenberg called on Nolan at Nolan's Kankakee Brewery once with her about business. Petitioner admitted that Preiss was a mere dummy selected by Greenberg. Then there is the testimony of Higgins, Nolan's lawyer, that he tried about 8 to 12 months after Nolan's death to collect a $1,500 fee, owed him by Nolan, from petitioner who said she didn't have the money. When the Quincy Street (Weber) Apartments were referred to as being owned by petitioner under the name of "Mary Mulcare", she informed him that she knew nothing about the apartments or the name "Mulcare", and assured him that if she had the money, she would pay him. There is also the testimony of Schweinsberg, a lender of money on real estate, that Nolan talked with *328 him about a loan on the Quincy Street apartments in 1935; and that he saw Hopkins' sign outside these apartments at that time as agent. A loan of $22,000 was obtained on these apartments, however, on May 9, 1935 from the Equitable Life Assurance Society of the U.S., the mortgagor being "Mary Mulcare". After part of the proceeds had been paid out for taxes, repairs and commissions, the balance of $9,000 was made payable by check to this fictitious woman, which was cashed on July 18, 1935, at the Prairie Bank, and a cashier's check issued for $5,042.78 payable to the First National Bank of Chicago, which the latter credited on the $15,000 mortgage executed by Nolan as "John F. Quick" on the Lawler Avenue apartments, the details of which have been already discussed under that head. The Prairie Bank kept no record of the purchaser of this cashier's check nor of one payable to L. Greenberg, although it had a record of others. The State and County Land taxes on this parcel were kept paid up through Nolan's life time. We must conclude on all the evidence that petitioner has not overcome the burden of proof raised by respondent's determination as to the Quincy Street (Weber) apartments *329 parcel. We are satisfied that Nolan remained the beneficial owner after the sales of 1933 and insofar as the evidence shows, until the day of his death. The value of this parcel should, therefore, be included in Nolan's gross estate. 5. Courtleigh Apartment bonds, par value $71,500 On June 30, 1927 Nolan, under the name of "Joseph Sullivan" bought 50 Courtleigh Apartment $500 bonds, serial Nos. 66 and 152 to 200, inclusive, which were due on July 10, 1933. In 1928 these bonds were "sold" to "Paul Hopson" (Nos. 152 to 170, inclusive) and to "John Cronin" (Nos. 66, and 171 to 200, inclusive). The question now before us is whether Nolan still retained ownership of these bonds or any of them at the time of his death in June 1937. Here is a summary of the evidence: In January 1934 an agreement to dismiss a foreclosure suit and to extend the maturity date of the bonds was made by the bondholders and Fred A. Johnson and his wife, the owners of the underlying realty. It was signed by various persons including one "James Kennedy" who purported to represent bonds Nos. 43, 44, 48 to 53, inclusive, 59, 64 to 66, inclusive, 68, 70 and 72 to 200, inclusive. It will be seen at once that Nolan's *330 original purchase of these bonds Nos. 66 and 152 to 200, inclusive, are here, but did he still own them? Johnson testified that after he signed the bondholder's agreement, he left it with Tomaso to get "Kennedy's" signature. Johnson and Tomaso constituted the bondholders' committee. Johnson did not see anyone sign this name, was not told by Tomaso who signed it, and did not know who signed it. We must resort to the evidence of checks for interest paid after the bondholders' agreement went into effect. Between July 1936 and May 1940 Johnson issued 8 checks for interest on these bonds. Before Nolan died in 1937, three checks had been issued, each for $1,430 and payable to "James Kennedy", on July 17, 1936, December 14, 1936 and May 20, 1937. After his death a single check was drawn to "Currency", for Johnson's convenience, he said, to obtain cash to pay the small bondholders who called at his office. The two checks drawn in 1936 were endorsed in this name (James Kennedy) by Nolan. The checks were drawn on Tomaso's bank, the Prairie State, and Tomaso initialed them. Tomaso testified unqualifiedly that Nolan endorsed those checks mentioned, and the petitioner admitted that the endorsements *331 were probably his; so we may conclude without serious doubt that Nolan was using the pseudonym of "James Kennedy" and retained, through the year 1936, dominion over the bonds. Respondent has sought to show by the evidence that the change from "Kennedy" to "Currency" was caused by Nolan's death, but Johnson testified that he was ignorant of this event. In any case, it hardly seems important. Nolan was so fertile in his invention of fictitious personalities that he occasionally forgot for the moment the precise appellation. In this instance, a mistake was made as to the name currently being used by Nolan, for, on May 15, 1935, Johnson drew a check for $1,430 for interest on Courtleigh bonds to "John Kennedy" and not "James". On December 12 of the same year he issued a check in the same amount to "John" but this check was not cashed. On December 16, 1935, however, a cashier's check for the same amount was bought at Tomaso's Prairie Bank payable to "John Kennedy", as shown by the cashier's record. Tomaso testified that the endorsement was Nolan's. Tomaso, when asked "And who is John Kennedy?" answered "Well, Mrs. McCue". And again, when asked whether he advised Nolan to sign the name *332 "Kennedy" answered, "No, I can't say that I picked out 'James Kennedy' for him to sign. I might have advised him if he didn't want to be bothered with the bondholders, not to put down his right name." Before considering petitioner's testimony, we may mention that of Louis Nies, the building contractor, and that of Meyer, the custodian of records of the First National Bank of Chicago. Meyer testified and produced bank records in support of his testimony, that Nolan, to secure notes which he made as president of the Kankakee Beverage Co., in obtaining a loan from Nies and his wife, deposited with the bank Courtleigh Apartments 4 percent bonds, serial Nos. 161 to 200, inclusive, par value $20,000, on September 21, 1935 and having paid the loan, withdrew them on July 14, 1936. These bond numbers, it will be observed, are the same as those bought by Nolan in 1927. When Nolan borrowed the money of Nies, he told him that he had 85 percent of the Courtleigh bonds and "was going to have them all". Nies fell sick and his bank required these bonds as security from Nolan and the deposit was made accordingly. We now turn to petitioner's testimony. She said that these bonds were among those *333 turned over to her by her husband in 1931. In 1934, however, her husband, she said, signed the bondholders agreement for extending the life of the bonds under the name of "James Kennedy", as though he still owned the bonds. Why he did not sign his own name, or why she didn't sign her name, she did not know, but supposed that it was to prevent other bondholders knowing the real owner. In 1935, however, she allowed Nolan to pledge the Courtleigh bonds for his loan, as though Nolan owned them. It is difficult to reconcile these inconsistencies. After this summary of the testimony we think it obvious that the evidence supports fully the conclusion, implicit in respondent's determination, that Nolan remained the beneficial owner of the Courtleigh bonds until his death; and that, consequently, they constituted part of his gross estate. 6. Eastgate Apartment bonds, par value $30,000 This story is not unlike the last. On June 30, 1927, Nolan bought some $300,000 of realty bonds at the Madison Square State Bank in Chicago, and among these were 50 (serial Nos. 76 to 125, inclusive) Eastgate Apartment bonds, par value $500 each, purchased under the pseudonym of "James Horner". In 1928 Nos. 76 to *334 80 were "sold" to "John Beall", Nos. 81 to 110, to "George Reid", and Nos. 111 to 125 to "Chris Segerson". These were aliases used by Nolan. The bonds were to mature in 1933, and on November 16, 1934, an agreement to dismiss foreclosure proceedings was entered into by the bondholders. Nos. 76 to 125 were at that time held in the name of "Margaret Dempsey". Johnson, who was also manager of this apartment, submitted the agreement to Tomaso, but did not know who signed as "Dempsey". On December 29, of the same year the bondholders ratified by a written instrument the selection at an earlier meeting of Tomaso and others as a bondholders' committee, and this likewise bore the name of "Margaret Dempsey" which was signed in a different handwriting. This, too, was left by Johnson with Tomaso for signature by the bondholders and Johnson testified that he was ignorant of who signed the name of "Dempsey". On April 1, 1937 an extension agreement was made by Johnson and his wife and the holders of Eastgate bonds. Again Johnson left the agreement with Tomaso to get the other bondholders' signatures and the signatures, "Margaret Dempsey", "Marie Moore" and "John Roach" were signed but by whom Johnson *335 did not know. So far, it will be seen, the evidence is purely negative. But we were told by Nolan's wife that Nolan used the names of "Margaret Dempsey" and had it written in "a little book" which served him as a memorandum of his "aliases". He also used "John Roach". It appears that Nolan had a cousin named Dempsey which may have suggested the name. The respondent calls to our attention the fact that the signature "Margaret Dempsey" is not in the same handwriting in the agreement of November 16, 1934 as in that of December 29. This is patent, but an examination of the former document discloses that both the Dempsey signature and that of R. C. Wieboldt, another bondholder, are followed by the initials "S.P.T.", doubtless those of Salvatore P. Tomaso, who doubtless signed both these signatures in that instrument. We know from his own statements that Tomaso, on occasion, signed other persons' names, and he may have done so here with their consent, but, in any event, the fact of his signing the name "Margaret Dempsey" would make inclusive any comparison of the two signatures. Tomaso testified that the name "Margaret Dempsey" on the agreement of April 1, 1937 was signed in his presence *336 by the petitioner. He said that she also signed "John Roach". This was before Nolan's death, it will be noted. Petitioner's testimony is not very clear on this lot of bonds, but, apparently, they are claimed, like the Courtleigh and others, to be part of the 2-foot stack which her husband gave her in 1931 or 1932, which he believed then, she said, to be worthless notwithstanding the substantial interest collections made during the years. Where her husband, Edward McCue, got them she did not know, but admitted he might have stolen them. Apparently, as to these bonds also, Nolan exercised control throughout his life in that he had "blacket authonity" to cash any checks for interest on them which he thought fit. It should be added that these Eastgate bonds, like most of the others here in question, were bearer bonds, and hence, title to them could pass by delivery. That is the evidence. It will be seen that it is not very conclusive. Three facts of significance support the respondent's contention: the same bonds were once bought by Nolan, Nolan used the names "Margaret Dempsey" and "John Roach", and checks of interest from these bonds were at Nolan's disposal whenever he wished them. *337 Negative in character, but of positive value is the obscurity in which Edward McCue's acquisition of them is wrapped. Insofar as the signatures of "Margaret Dempsey" and "John Roach" go, nothing can be deduced from their variance, if proved, beyond what is confessed, that no such persons existed and, consequently that the signer, or signers, of these names in the various bondholders' instruments would probably vary in their signatures. Here again, the evidence is inclusive, for both Nolan and the petitioner used these names, and if Tomaso's evidence is to be believed, petitioner signed these names in his presence before Nolan's death. However, if she did, it is possible, or even probable, that she did so on Nolan's behalf. There are no clear acts of dominion exercised by Nolan after the alleged transfer, as in the case of the Courtleigh bonds, but it is suggested by the evidence that he did. On the other hand, we are not satisfied that petitioner acquired title from her husband in 1931 or that McCue ever had title: it is probable that in all the circumstances both he and his wife, the petitioner, were mere agents of Nolan's. In this state of the evidence, we are of the opinion that *338 petitioner has not overcome the prima facie correctness of this determination. Consequently, we hold that the Eastgate bonds in the amount set out were part of Nolan's gross estate. 7. Belporte Apartment bonds of a par value of $10,000 The important distinction between these bonds and the other real estate bonds and apartments acquired by reason of ownership of bonds, is that here there is no evidence showing that they were a part of the bonds originally purchased by Nolan. The evidence with regard to them is extremely meagre. On September 28, 1934, an agreement was made between the bondholders of the Belporte Apartment bonds, the Johnsons, the owners of the property, and the Prairie Bank. It bears the names of various bondholders, including that of "Margaret Dempsey", representing bonds Nos. 99 to 118, inclusive, in the par value of $10,000. Johnson left this agreement with Tomaso for "Dempsey's" signature and Tomaso obtained it. Tomaso being asked whether he saw petitioner sign it, said he "was pretty sure he did". On March 18, 1936 a check for $200, representing interest at 2 percent on $10,000, was drawn on the Prairie Bank by the bondholders' committee for Belporte bonds, *339 payable to Tomaso, as agent for certain bondholders. Tomaso was also a member of the bondholders' committee. Tomaso, "M. Dempsey" and the East Fontenelle Apartments endorsed this check. On the day of the check's issuance Tomaso made a deposit slip for Nolan's account in the same amount with the notation "Bel" at the bottom, which, Tomaso testified, represented the amount received as interest on the Belporte bonds. The only evidence connecting Nolan in any way with these bonds is the use in the agreement of the name "M. Dempsey" which was signed by petitioner and the deposit of one interest check to Nolan's bank account. However, the story of petitioner as to her acquisition of these bonds is, as we have indicated, unconvincing, improbable and uncorroborated. We think that what evidence we have as to these bonds supports the respondent's determination, and hold that their value should be included in Nolan's gross estate. 8. Eden Apartment bonds, of a par value of $35,000 On September 1, 1932, an agreement between Glenn and Majory Eden and the bondholders of the Eden Apartment House was made to extend the mortgage until 1936. Among the bondholders signing this were "John Hill" *340 of Danville, Ill., and "Geo. Peterson", also of Danville, representing, respectively, bonds Nos. 21 to 50 inclusive, and 51 to 90, inclusive, in a total par amount of $35,000. These serial numbers are the same as those of the Eden bonds included in the large lot of bonds bought by Nolan in 1927. At that time they were purchased in the name of "James Horner". In 1928 they were "sold" to James Kelley, Frank Scott and Hugh Tillotson. There is no evidence to show how they came to be held by "Hill" and "Peterson". Tomaso testified that he signed the name "John Hill" to this agreement and got Edward McCue to sign that of "Geo. Peterson". He also said a moment later that McCue asked him to sign "Hill's" name, while McCue signed "Peterson". The uncertainty on this point is immaterial, for the essential facts are that no real person of either name signed, and that the signing was done in concert by Tomaso and McCue. Some two years later, on November 12, 1934, Milton Hart, a lawyer, who did not know either "Hill" or "Peterson", but who represented the Edens and Josephine Herrmann in a suit to foreclose the mortgage, drafted a letter for Hill's and Peterson's signature, addressed to his firm, *341 Hart and Shomberg, in Chicago. This letter recited the fact that Hermann's suit had been filed, stated that Hill and Peterson represented $35,000 par value of the bonds and asked that they be joined in the same suit as parties plaintiff. The bonds are referred to by serial number. Hart mailed this letter to Tomaso for "Hill's" and "Peterson's" signatures. This letter was written at Tomaso's suggestion, and he admitted that he signed "Hill's" name. It does not appear who signed "Peterson's" name to the letter. Petitioner testified that she did not sign the bondholders' agreement of 1932, and did not authorize anyone to sign it in the names "Hill" or "Peterson". She pleaded ignorance also of these signatures on the letter and checks. She also said that she did not know the serial numbers of the Eden bonds of which she claimed ownership. She said that she did not have anything to do with Hart's retainer. On November 16, 1938, nearly a year and a half after Nolan's death, the Eden Apartments were sold and an escrow fund created with the Chicago Title & Trust Co. for owners of the bonds. The Title Co. issued voucher checks drawn on this fund which had to be signed on the face as a receipt, *342 one for bonds Nos. 21 to 50, inclusive, for $9,000 to "John Hill", and another for bonds Nos. 51 to 90, inclusive, for $12,000 to "Geo. Peterson". Tomaso testified that he signed the name, "John Hill" on the face of one of the checks and also endorsed it so, his only reason being that he had also signed the agreement. He also testified that John McCue, the son (the father being then dead) had signed "George Peterson" on the other check. McCue confessed that it looked like his signature, that he might have done it, but he did not receive the money. Petitioner, as said, was quite ignorant of who might have signed the agreement or checks, but she testified that she sold the Eden bonds in 1938 and received for them, she said, "in the neighborhood of $20,000 * * * maybe $21,000." It will be observed that the total price brought by the two "Hill" and "Peterson" lots was $21,000. This is all the evidence and it comes to this: That Nolan originally owned the Eden bonds here in question; that all transactions involving them from 1932 to their sale by petitioner in 1938 were done under false names, by petitioner's husband or son, or Tomaso, who undoubtedly, on the whole body of evidence in *343 the case, was privy to Nolan's and petitioner's devious machinations; and that on the final sale of the bonds after Nolan's death, petitioner received the benefits. We are confronted, therefore, with much the same question as was dealt with in a previously considered transaction, when Nolan exercised no known acts of dominion in the latter years. We were told by petitioner that her husband gave her a lot of bonds in 1931 or 1932, a self-serving statement with no evidence to support it. On the other hand, it appears here that petitioner did not openly avow herself the owner of these bonds at any time, but exercised her control through fictitious names. We are thrown back again, therefore, on the respondent's determination and the weight to be given it; and in all the circumstances we can not say that its presumed correctness has been overcome by petitioner. We hold, as to the Eden bonds, therefore, that their agreed value was part of Nolan's gross estate. 9. St. Anne Apartment 6 1/2 percent bearer bonds, of a par value of $32,000 The same story is repeated here, with some variations. Nolan in 1927 had bought as "Jos. Sullivan" 50 of the $500 St. Anne Apartment bonds maturing *344 in 1933, including serial Nos. 17 to 66. In 1928 they were "sold" to "Frank Lorenz", "Herbert Klauk" and "Joseph Kenney". On December 29, 1932, Joseph and Sarah Kahn quitclaimed the land and apartment house securing the bonds to George Lorenz, whose wife was related to Nolan and who was working for him at the Kankakee Beverage Co. during the year. Lorenz testified that he never at any time had any interest in this parcel. Nolan, on the other hand, informed his daughter, now Marcella Beerly, the intervenor in this case, that among the realty investments which he had made was the St. Anne Apartment house. Nearly five years later and after Nolan's death, on July 14, 1937, a master in chancery of the Circuit Court of Cook County, pursuant to a decree of that court, entered on July 24, 1933, or 4 years earlier, sold the mortgaged apartment house to "Marie Kelly" for a bid price of $11,500. The price was paid in cash and in the apartment house bonds, Nos. 17 to 80, inclusive. They were bearer bonds, however, like most of the others here involved, and would pass by delivery. "Marie Kelly" was a name used in this instance by petitioner, for she signed at Tomaso's suggestion, she testified, *345 that name on the back of the master's certificate of foreclosure sale, as will appear later on. On March 14, 1938 petitioner, under the name of "Marie Kelly", acknowledged before a notary in a form stamped on the back of the master's certificate that Geo. Lorenz had on that day paid her the full amount which she had bid for the apartment house, with interest, costs and taxes, and that accordingly Lorenz had redeemed the parcel and her master's certificate of sale was therefore void. Lorenz was holder of the fee only in name, however, for he testified that he never had any interest in it. The acknowledgment by petitioner, moreover, was made entirely without Lorenz's knowledge or consent, and by the same token, without his having done any of the things stated and acknowledged therein. But Lorenz was to be only a conduit of title, for on April 19, 1938, petitioner, acting still without his knowledge or consent, had her son, John, appear before a notary as George Lorenz, a bachelor, and in that guise to sign a quitclaim deed conveying the parcel to her, not as "Marie Kelly" but as "Mary Crummie, spinster". She gave as her reason for the act that she did not want anyone to know that she *346 owned the St. Anne Apartment house. Summing up the evidence, we are unable to say that petitioner has here overcome the presumptive correctness of respondent's determination. We hold that the bonds to the extent of the value claimed were a part of Nolan's gross estate. 10. Capitol Theatre bearer bonds, par value $11,000, held in the name of "Joseph Newman" This bond transaction shows a variant not present in most of those previously considered, for the bonds were not a part of the $300,000 lot which Nolan bought at one time in 1927. On May 13, 1933 an escrow receipt was issued by the Chicago Title & Trust Co., as escrow agent, stating that it had received from "Joseph Newman, 1319 S. Kenilworth Ave., Berwyn, Ill." National Theatres Corporation Capitol Theatre Building gold bonds, issued under a trust deed to the Chicago Title & Trust Co. on August 20, 1923. The escrow receipt bears a written notation over the name of "Joseph Newman" that the bonds were received by Newman on August 9, 1933. Petitioner never lived at the Berwyn address while Nolan gave that address as his own on his Federal income tax return for 1932. Petitioner professed to be present when her husband bought *347 these bonds, but knew nothing of the name "Joseph Newman" or of the Berwyn address. She testified that Nolan never lived at the address given, but she had heard that he conveyed land to one Edith Kissan (or Costain) under the name of "Joseph Newman". Such a deed executed by Nolan in the name of "Joseph Newman" was introduced in evidence. It seems conclusive, therefore, that "Joseph Newman" was another of the numerous pseudonyms which Nolan used. The only question for us is whether he used it in connection with the Capitol Theatre bonds. Another line of evidence brings us nearer to the answer. The loan security record of the Prairie State Bank of Oak Park shows that Nolan on December 24, 1934 deposited as security with that bank for a loan Capitol Theatre First Mortgage Building bonds in the principal sum of $10,000. All of these bonds were included in the lot covered by the escrow receipt of May 13, 1933. The Prairie Bank's records further show that these bonds were withdrawn by Nolan on March 2, 1937. There were also put in evidence two deposit slips, dated April 11, 1935, and March 9, 1936, each for $250, crediting Nolan's account in the Prairie Bank with $500. Tomaso, an officer *348 of the bank, testified that they bore notations, respectively, of "Capitol Theatre interest" and "coupons", and both represented interest on Capitol Theatre Bonds deposited by Nolan as collateral security. This is all the evidence, and we think it is enough. It has been proved that Nolan used the name "Joseph Newman" in one transaction, and it seems probable, therefore, that he used it in others. The street address of "Newman" was one used by Nolan. The bonds deposited by Nolan as collateral security with the Prairie -Bank were certainly the same bonds once held by "Newman". We know that Nolan as late as March 9, 1936 exercised full dominion over these bonds, to deposit them as collateral for his loans and to receive interest on them. There is no evidence, on the other hand, that petitioner ever received the bonds from her husband or that her husband ever owned them save her unsupported word. We conclude, therefore, that the stipulated value of the Capitol Theatre bonds in the amount determined was a part of Nolan's gross estate. 11. Kankakee Beverage Co. First Mortgage 6 percent bearer bonds of a par value of $156,000 We pass now to the Kankakee Beverage Co. bonds which raise *349 somewhat different questions from those previously considered, since Nolan himself was the original majority owner of this company. McKenzie, a registered accountant, on the stand testified to the meaning of the company's books. His firm, McKenzie, Evans & Co., had been employed by Nolan to audit the company's books for the years 1933 to 1936, inclusive, which McKenzie testified, were in a confused state, and it made a report which is in evidence. It appears from this report and the parts of the books put in evidence, as well as from McKenzie's testimony, that the company issued and had outstanding on December 31, 1936, $178,000 par value of its own bonds. These were recorded on the books as "issued to officers for advances", and it appears that the "advances" were made by Nolan and others, notes taken, and all these notes payable taken up by the corporation and exchanged for its own bonds. It is stated in the audit report that the First Mortgage bonds were issued "in full of all loans" except two judgments and "a small balance" resulting by reason of the bonds "being in even thousands"; and McKenzie's testimony was to the same effect. The total amount of "borrowed money", not covered *350 by the bonds, is shown on December 31, 1936 by the company's balance sheet as $3,586.90. An effort was made by petitioner's counsel to show that the company had other notes payable outstanding on this date which were not covered by the bond issue, but we are unable to conclude from the record that this was so. The first Mortgage trust indenture shows an authorized issue of bonds in a par value of $200,000, but it does not appear that more than $178,000 were actually issued. Nolan was president of the company and advanced $155,962.73 and received as his share bonds of the par value of $156,000. Two collateral lines of testimony support this conclusion. Nolan in 1934 or 1935 told Louis Nies, a contractor whom we have had occasion to mention before and from whom Nolan was seeking to borrow money, that he owned 85 or 90 percent of the Kankakee Brewery. Nolan also told his daughter Marcella, that he had invested about $175,000 in the Kankakee Beverage Co. Petitioner testified that Nolan had given her certain promissory notes executed by the Kankakee Beverage Co. for loans he had obtained of her and that she found some of these in going through her papers after the Commissioner's investigation *351 of her tax liability arose, while others she had surrendered to Nolan in exchange for the $156,000 Kankakee bonds now in question. At another time she said that Nolan gave her $182,000 in Kankakee bonds in 1936, and that she afterwards found $35,000 in Kankakee notes not surrendered. These bonds and the stock in Kankakee held by her son, John, and acquired by him from Nolan, she said, she sold about 1943 for $20,500. She said that Nolan owed her in all $160,000; that she first began making loans to him when he opened the brewery in 1933, and continued to do so in 1934, and probably 1935 and 1936. These loans were made in varying amounts, she testified, from the fund of $200,000 given her by Nolan in 1926. Nolan gave her notes of the Brewery Co., one of which, signed by Nolan as president and Henry A. Baumann as secretary-treasurer, dated June 23, 1934, for $15,000, was put in evidence, as well as several others. Petitioner herself kept no records. Respondent points out that the testimony of Hagerty, who was an accountant with Kankakee from April 1933, to June 27, 1936, shows that he knew nothing of such notes; that this is supported by the evidence of McKenzie, the auditor. The essential *352 question is, of course, whether petitioner lawfully owned the bearer bonds of Kankakee which she had in her possession, since these were exchanged for all the outstanding obligations of the company, and her notes from the company whether false or genuine were the notes of the company, not Nolan. The basis of petitioner's contention in regard to these bonds runs through the whole of her case and is to the effect that she loaned to Nolan $160,000 from the $200,000 given to her in cash by Nolan in 1926 or 1927, which was kept by her in various safety deposit boxes in currency of large denominations. No evidence except her own word exists as to Nolan's gift of $200,000. No reason is shown by her why, if this was an absolute gift, it should have been secreted by her for so many years and used by her only for the purpose of making advances to Nolan or to develop, under fictitious names, properties originally acquired by Nolan. No evidence was adduced tracing any considerable money into her checking account, or even showing the existence and extent of such checking accounts. No showing is made that she ever paid local taxes on this large amount of cash. Her uncorroborated story that Nolan *353 gave her $200,000 as an absolute gift is so improbable that we can not accept it. It is much more probable that Nolan, during the time of his domestic trouble, entrusted his cash to petitioner, or transferred it from his own home to that occupied by the McCues for safe keeping where it remained in the steel safe to which both he and his agent, the McCues, had access. What is clear, however, is that respondent has made a determination of Nolan's continuing ownership till death of the Kankakee bonds which must be overthrown by petitioner to win on this count. We can not say that petitioner's evidence sustains this burden, and we hold, therefore, that the Kankakee bonds of $156,000 par value were part of Nolan's gross estate. The only question remaining under this head is the value of these bonds and this may be quickly disposed of. The substance of the evidence is that the brewery had a going-concern valuation of from $25,000 to $50,000; that it had been operated as a brewery to within 6 months of the critical date in 1937, but apparently not very successfully; and that after some 6 or 7 years of deterioration of the buildings, the bonds on it were sold by petitioner in 1943 for *354 $20,500. Obviously, any increase in valuation of the buildings by reason of war conditions would be more than offset by their depreciation in the intervening years. We conclude, therefore, that all the bonds covering the buildings and land were worth at the time of Nolan's death not less than $20,500; and since he owned 156/178 of the total bond issue, or, in other words, that proportion of the property itself, that that fraction of $20,500 constituted part of his gross estate. 12. Dwelling-house at 1045 North Park Avenue, River Forest, Ill. On June 28, 1928 Lambertus Buurma and his wife conveyed a lot in the village of River Forest, Ill., to Edward J. McCue and his wife, the petitioner. Some six months before December 1928, or at about the time of purchase a building contractor named Guethlein, who dealt entirely with the McCues and did not know Nolan, erected on this lot a 9-room dwelling-house and 3-car garage, now numbered 1045 North Park Avenue, which the respondent refers to for some not apparent reason as "palatial". In December 1928 the McCues moved in and petitioner and her family have occupied it ever since. The lot cost between $20,000 and $22,000 and the house, on *355 the testimony of the contractor, Guethlein, $44,000. It will be seen that the title to the lot and house was in the McCues from the beginning, and the only question is whether they were bought with Nolan's money on his behalf and, in fact, were beneficially owned by him at death. In tax cases we deal with the realities of a situation and not with the formalities of title, and although a recorded legal title to land creates a prima facie presumption of ownership in the title holder, that presumption may be overcome by evidence showing that the real or equitable ownership lies elsewhere. And if the evidence indicates that this is so, we are not concerned in a tax case with the niceties of chancery doctrine upon resulting or constructive trusts. We do not think that the evidence here justifies a conclusion that Nolan was the beneficial owner of the house held openly in the name of and occupied by petitioner for so many years. Respondent in this issue relies largely upon declarations testified to have been made by Nolan to the general effect that he had built this home for himself and his family. The witness Nies was confused in his testimony on this point and the testimony of Nolan's *356 daughters was so obviously biased and self-serving as to be, in our opinion, worthless. The only testimony of this type which we feel supports respondent on this issue is that of Nolan's nurse who testified that during Nolan's last illness he stated to her that the house was his, that he had built it for his family, and that it was put in his sister's name in order to conceal its real ownership from the Federal government. The circumstances corroborating respondent's determination as to this property are that Nolan was a wealthy man, that McCue, until 1927, was employed at a small salary, that, consequently, petitioner's testimony that McCue paid for the home was intrinsically improbable, and that Nolan and his two daughters did frequently live in this home. However, with regard to this last circumstance it is significant that during the last year of Nolan's life the relationship between the McCues and Nolan's daughters was obviously strained, and his daughters, not the McCues, absented themselves from this home, which remained in the name and possession of the McCues. The circumstance of Nolan's wealth is significant only if we conclude that McCue was poor, not as compared with *357 Nolan, but too poor to buy this property. We do not know what Nolan paid McCue for his services. Considering that Nolan had a gross income at this period of around $15,000 a week and that McCue was his general business agent and all-around right-hand man we think it likely that McCue's salary was such that he could buy such a home on his own account. Perhaps Nolan advanced to McCue some of the money needed for the cash payments made, and probably it was understood between the McCues and Nolan that Nolan should have the use of the home whenever he wished and that his children would always be welcome there. But nothing indicates that McCue could not and would not spend a considerable sum in acquiring a comfortable home for himself, his wife and his three children even to the extent of putting into it all his available cash and advances made to him by his brother-in-law, with whom he was then entangled in a profitable illicit business. Thus, discounting the circumstances relied upon by respondent, we have the testimony of the nurse who, it may be pointed out was extremely hard of hearing, to the effect that Nolan told her that the house belonged to him, as opposed to the facts that *358 McCue authorized its construction after normal conversations with his wife as to plans, that title to the property was taken in the name of McCue and his wife, as joint tenants, that McCue paid for the lot and the house, that he, his wife and family lived there and his wife and family still live there. In this transaction no aliases were used and no prior ownership of Nolan has been proved. On this issue we have held in favor of petitioner. 13. Improved real estate at 4100 Armitage Ave., Chicago This transaction lacks the picturesque character of many which we have discussed. Joseph Sykora was a tavern-keeper who bought beer of Nolan's truck drivers during the Prohibition period, and who owned improved real estate located at 4110 Armitage Avenue, Chicago. Sykora knew McCue as the brother-in-law of Nolan and had paid him for beer obtained from Nolan. Sykora's second mortgage on this property was about to expire and he was looking about for a new mortgagee; and so, on one of McCue's visits to sell beer or collect payment, Sykora asked him for $6,000 as a second mortgage loan. In a week or so McCue informed Sykora the money would be had and the two went together to a bank on *359 the north side of Madison Street within one block west of Crawford Ave. Sykora waited outside the bank while McCue went in and got the money, gave it to Sykora, and took a second mortgage on January 15, 1929. Sykora was then or later threatened with foreclosure by the first mortgagee unless he should pay a premium and interest, and therefore offered to sell the parcel to McCue. McCue replied that he didn't want it, but that Sykora could convey it and could, if he liked, redeem within a year, Sykora thereupon caused a deed to be executed showing "Edward J. McCue" as grantee, at Berwyn, Ill., and the Cicero Trust and Savings Bank, Trustee, as grantor. Sykora testified that McCue told him that he might redeem the parcel and "it is all right with us". He did not enlarge any further on who was meant by "us". The first instalment tax notice for local taxes in the year 1935 was made out to "E. J. McCue, 1319 S. Kenilworth Ave., Berwyn, Ill." It will be observed also that Sykora's deed of 1931 gave Berwyn as McCue's residence. On the tax bill the typed Berwyn address has been scratched out and McCue's River Forest address substituted in ink. The McCues never lived at the Berwyn address, *360 but Nolan used it in the escrow receipt for Capitol Theatre bonds, already discussed, under the pseudonym of "Joseph Newman", and again, under his own name, in his Federal income tax return for 1932, the year after the conveyance by Sykora to McCue. On this evidence we are unable to agree with respondent that the beneficial ownership of this property was not in the holder of the record title. Again it will be noted that no aliases were used in this transaction and that Nolan never was connected with this property or exercised any dominion over it. We hold, therefore, on this issue in favor of petitioner. 14. Six parcels, stipulated to have been owned by Nolan before May 19, 1937; and said by petitioner to have been conveyed to her by him on May 19 and 20, 1937 Before May 19, 1937, Nolan was the owner of 6 parcels of realty, fully set out in our findings, the aggregate value of which has been stipulated to be $31,902.09. These are said by petitioner to have been conveyed to her by Nolan by quitclaim deeds executed by him on May 19, and 20, 1937, and at a time when, so respondent contends, Nolan was so sick and his hand so cramped by arthritis, that signing his name would have *361 been impossible. He contends, moreover, that the quitclaim deeds were forged by petitioner's son, John, who was a clever penman and is known to have signed other names than his own to documents. Jordan, petitioner's lawyer cousin, who has figured in other transactions, testified that he prepared 6 quitclaim deeds for Nolan's signature, all of which Nolan signed (although Jordan did not see him sign them and had himself no personal knowledge of the act). One parcel was conveyed to petitioner by Albert J. Lambert and his wife on October 24, 1937, after Nolan's death. Lambert was a real person who held title for Nolan. He had conveyed back to Nolan, but Nolan never recorded the deed, and petitioner, instead of recording Lambert's deed to Nolan and Nolan's to her, requested the Lamberts to execute a new deed directly to her. Petitioner paid the Lamberts no consideration for his deed to her. They executed their deed merely to carry out the intention of Nolan as indicated in his unrecorded deed. Several other of the parcels were held by Nolan in fictitious names, the Hermitage Avenue garage building in the name of "John Lacey", the Pauline Avenue bungalow in the name of "Frank Janda", and *362 the "Hollywood Cafe" at Lyons in that of "Edward J. Schuster". Jordan said he consulted the Chicago Trust & Title Co. about how such a conveyance should be made, and was advised that Nolan should use his own name and also the pseudonym as grantor. All six deeds (or the five used) purported to have been executed by Nolan on May 19, or 20, 1937. The first question is whether he signed them, or in the circumstances of his physical condition, could have signed them. In considering the evidence on this question we must admit that the question is a close one. Five of the deeds are in evidence, on their face executed by Nolan. The sixth deed was executed at the same time and never recorded, because the then nominal title holder, Lambert and his wife, were willing to make a direct conveyance to petitioner on the strength of Nolan's deed. Nolan was at that time a sick man and apparently knew it. It would not have been unreasonable for him in the circumstances to have made a transfer of these parcels to his own sister, as she says he did. He was probably beyond the point where he thought of her as a possible "living alias" behind which to conceal his own ownership; although it might also be *363 plausibly argued that since he had used her for this purpose for so long, these transfers might well be but another instance of the same intention. However that may be, we have before us the evidence of an apparent transfer, and there is no evidence that Nolan ever later exercised any dominion over, or received any profits from, these parcels. We come, then, to the question of fact, whether Nolan actually signed the deeds, and if he did, the secondary question, whether he made the transfers in contemplation of death. On the respondent's side, there is the testimony of a disinterested witness, the nurse, that Nolan's arthritis would have made any signature difficult and the smoothly running signature of the deeds well-nigh impossible. This professional opinion is fortified by her testimony that he tried to write with a pencil and found it so difficult that he gave it up in despair. The physician's testimony is to the effect that Nolan's arthritic condition which was more or less chronic would not have made his signing of papers appreciably more difficult toward the end of his life than before, although the weakness resulting from his other illnesses might have affected his ability *364 to write. He also said that persons suffering from uraemic poisoning, had bursts of energy at times when they could do much more than at other times. It is impossible for us to say on these facts that Nolan could not have signed the deeds, and ignore the presumption of validity raised by the acknowledgments before a notary. Is there evidence that someone else signed them? There is a very large possibility that John McCue, petitioner's son, who on his own and his mother's confession signed other persons' names, might also have in this instance signed Nolan's; but we do not know that this was so. The only man who must have seen Nolan sign, if Nolan did sign them, was the notary, O'Brien, and he was not called as a witness. Neither did the respondent adduce the testimony of experts in handwriting. Considering the evidence as a whole we have concluded that Nolan transferred or caused to be transferred to petitioner as a gift the six parcels of real estate here considered. However, we still conclude that they (or their values) should be included in Nolan's gross estate. The conveyances were made in part on May 19, and in part on May 20, 1937, and Nolan died on June 29, 1937, not a month *365 and a half later. There can be no doubt on the evidence that Nolan was at the time of the conveyance quite sick, and knew himself to be so. The statute provides that transfers made without consideration (and there was none here) within 2 years before the donor's death are to be deemed made in contemplation of death. This presumption has not been rebutted. Petitioner contends that the consideration for them consisted of loans made by her to Nolan in the sum of $160,000. For reasons previously set out we do not believe the petitioner's testimony in this regard. Respondent's general determination that these properties should be included in Nolan's gross estate supports a finding by us to this effect even though the precise reason which we have held valid, to wit: that their transfers were made by Nolan in contemplation of death, was not specified by respondent until at the hearing herein. See . We hold, therefore, that all six parcels are includible in Nolan's gross estate. 15. 100 shares of Food Machinery Corp. Common stock par value $100 We now enter upon the last but one of this sordid series of transactions, which has to do with *366 the rightful ownership of 100 shares of Food Machinery Corporation common stock. Sprague-Sells Corporation class A stock was owned by Nolan on March 17, 1926, and on a reorganization of the company, was exchanged for the 100 shares of Food Machinery stock. This took place in 1929, the successor corporation originally having the name of The John Bean Manufacturing Co. which was changed later in the same year. On July 22, 1927, apparently, Nolan transferred the 200 shares of Sprague-Sells stock to the name of "Joseph Donnelly, 5023 Maypole Ave., Chicago, Ill.", for the original stock certificates showed cancellation on July 23 and the stock reappears in the new name. At that time Nolan had just separated from his wife and was living with the McCues at this address. He stayed there only a few weeks, petitioner testified. On December 1, 1928, a certificate of deposit for 200 shares of Sprague-Sells was issued to "Joseph Donnelly", as of the Maypole Street address but this was crossed out and "# 5043 W. Adams St." substituted. This certificate was endorsed by "Joseph Donnelly" in blank on May 8, 1929. According to the testimony of petitioner, the stock remained in the name of "Donnelly" *367 until after Edward McCue's death on October 31, 1934. She said she found the stock certificates "when I was going through McCue's papers after his death"; and added: "Well, at that time I did not know anything about the stock. I asked my brother if he knew anything about it or if it was his. He said he did not know anything about it and that it was not his, and, as I remember, I received a letter, or Joseph Donnelly received this letter, that the stock was going to be called in and issued. Now, I do not know whether it was to be issued for more certificates or just what this letter was, but it seems to me that they were to issue more stocks * * *. I sent the stock in to the Food Machinery and had them issue the new stock in my name". She further testified with respect to the alleged gift by Nolan to her of $200,000, that no part of it was used in paying for her River Forest residence, nor for the Ogden Avenue parcel, nor did her husband use any of it in buying these stocks. On being asked whether she knew who signed the name of "Joseph Donnelly" to the transfer of this stock after McCue's death, she answered: "No, I do not, I know very little about that stock." That is the whole *368 story. We have set out the evidence fully in order to show the paucity of proof proffered in overcoming the respondent's determination that the stock was Nolan's. It is true we have a categorical statement by petitioner that Nolan told her the stock was not his and that he knew nothing about it, but Nolan's statement is belied by the evidence. Nolan knew something about the stock, at least, that he had once owned it; unless we must suppose that the multifariousness of his transactions for the moment put his ownership out of mind. The endorsement of the certificates after petitioner found them and had them in her sole possession goes entirely unexplained. We must conclude on all the evidence that the stock was bought by Nolan and remained equitably his until death, regardless of later nominal owners, whether real or fictitious. We hold that the value of this stock (based on its proportion to the aggregate values stipulated) was properly includible in Nolan's gross estate. 16. 100 Shares Union Carbide & Carbon Common Stock; 100 Shares Houdaille-Hershey Class B stock; 100 Shares Borg Warner Corporation, $5 Par Common stock; 12 Shares Atlas Corporation, 6 percent Preferred stock; 63 *369 Shares Atlas Corporation Stock; 100 Shares Advance Aluminum Casting Corporation stock We pass now to the second part of the stocks said to have been found by petitioner on McCue's death in 1934, the aggregate value of which, including the Food Machinery Corporation stock already considered, has been stipulated to have been $23,126 on Nolan's death in 1937. The situation of petitioner in respect of this stock was the same, with one important exception, as in respect of the Food Machinery stock just considered. The distinguishing fact is that it has not been shown that this stock ever belonged to Nolan or was held by him under fictitious names. Petitioner, on the witness stand, said: "Well, after Mr. McCue's death, I found that stock [Union Carbide] with his papers, and I noticed that it was signed by him on the back, and I sent the certificates in and had them issued in my name". She said the same was true of the other stocks. She said that she did not know whether the stock was held by McCue as a nominee of Nolan but did not believe so. She did not probate McCue's estate and filed no inheritance tax return of it with the State of Illinois. There are no facts to show that Nolan *370 owned these stocks at death. They appear to have been purchased by McCue, to have been in McCue's name when McCue died, they were duly transferred to petitioner's name thereafter, and there is no evidence that they were ever Nolan's. Petitioner's failure to file a state inheritance tax return is noted, but any inference, drawn from this fact, that McCue was merely the nominee holder for Nolan is too far fetched to have value. In the absence of facts contradictory of the record ownership, we accept the ownership of McCue of these securities. We hold, therefore, that the value of these stocks was not properly includible in Nolan's gross estate. The proportionate value of the Food Machinery stock to the aggregate value stipulated must be ascertained by agreement of counsel under our rules. We note that respondent has put this figure at $4,900. 17. Medical and funeral expenses deductible Petitioner testified that Nolan had no money at the time of his death and that she, consequently, paid his funeral expenses, which came to $1,243.93. The amount has been stipulated. Petitioner filed no claim against Nolan's estate for these expenses when she learned that it was to be administered. *371 Dr. Latimer, Nolan's physician, testified that his fees for attendance were not paid until after he had reduced the amount and threatened suit some 2 years later, when petitioner paid him $225. The amount was stipulated. No question is made of the estate's right to deduct these sums, and they are accordingly allowed. 18. General conclusions in Estate Tax Cases In Docket No. 233 respondent has fixed John J. Nolan's gross estate for Federal estate tax purposes at $293,564.50 and determined a deficiency thereon against petitioner as transferee of the estate. In Docket No. 234 a deficiency in a similar amount is determined against petitioner as statutory executrix of the estate. No part of these taxes has ever been paid. In the body of our opinion we have already indicated those particular parcels which we thought the evidence could not sustain us in saying were a part of Nolan's estate, and these, of course, should be excluded, and the tax recomputed accordingly. Of the parcels of realty, bonds and stocks included we have no doubt Nolan was the real and beneficial owner. The basis for our inclusion in Nolan's gross estate of the several items already discussed is our conclusions *372 that Nolan beneficially owned these properties and in order to prevent his estranged wife, and more particularly the Federal government, from discovering his ownership he caused them to be held under fictitious names; that he depended upon petitioner and her husband for management services with regard to these properties; that he kept a large amount of cash in the home occupied by petitioner and her husband for his own use and for the use of petitioner and her husband in the management and development of these properties and in the general carrying on of his business interests; that the fictitious names in which these properties were held were symbols of his ownership but could be used either by him or by the McCues in the transaction of business; that when petitioner used these names, administered these properties or made use of Nolan's money, she was acting in a fiduciary capacity as to Nolan; and that upon his death she continued to hold this property subject to her control as fiduciary with reference to Nolan's estate and to his creditors. There is another hypothesis which we consider as a possible explanation for the mass of facts which we have already pieced together: That *373 during Nolan's last years petitioner systematically gathered under her control and into her possession Nolan's properties without his knowledge and consent. This hypothesis seems to us less likely than our conclusions above stated, but can not be ignored. Respondent's determination that petitioner is liable for estate taxes as executor under the definition of section 300 (a) of the Revenue Act of 1926 is obviously justified by our conclusion that Nolan was the beneficial owner at the time of his death of property which petitioner admits was in her possession during a time when there was no other executor or administrator. However, the determination of deficiency asserted against petitioner in Docket No. 233 is addressed to her as transferee and in this case the respondent has the burden of proof. In a consideration of this docket number we take it as established by the evidence that Nolan at the time of his death was the beneficial owner of certain properties upon which our conclusions have been stated above, and that petitioner at all times since was in possession of these properties or their proceeds. As to those properties transferred to her in contemplation of death she is *374 clearly a transferee. As to those properties not so transferred to her by Nolan and as to which she is statutory executrix we have the question whether she can also be considered as a transferee. We considered a somewhat similar problem in , in which it was contended that the liabilities for estate taxes of an executor and a transferee were inconsistent, and that the same transfer could not make a person both executor and transferee. In that case we decided against both contentions, even though the determination of deficiencies were made against the taxpayers in both capacities in the same notice. In this case the determinations were made by separate notices and were contested by the petitioner in separate docket numbers. Also in this case it is not necessary to find, except as to the properties transferred in contemplation of death, that the same transfers made petitioner both executor and transferee. It is not necessary that a physical delivery take place in order to establish transferee liability if there has been a transfer from a person acting in one capacity to himself acting in another capacity. See Paul, Federal Estate and Gift *375 Taxation, § 13.50; . If petitioner here was in possession of Nolan's property in a fiduciary capacity and either before or after his death took action with regard to this property which unmistakably indicated that she ceased holding it in a fiduciary capacity and thereafter held it in her individual capacity, she would properly be considered as a transferee, if the property remaining in Nolan's estate was insufficient to pay the estate tax due. The evidence indicating that petitioner's possession of such property in this case ceased to be that of a fiduciary and became that of herself as an individual is found in her income tax returns filed in 1938 claiming the income from many of these properties as her own and in her petitions filed in these cases in which she makes the claim that these properties were owned by herself as an individual. We therefore conclude that at some time after 1937 and subsequent to her possession of these properties as an executrix she became the transferee thereof, and is liable as such for the estate taxes to be determined in docket No. 234. One question affecting the estate tax involved in dockets numbered *376 233 and 234 still remains, and that is the amount of deductions allowable to the estate. The amount of decedent's medical and funeral expenses have been stipulated and are allowed, but in addition, there are two claims made by the Commissioner which would materially lessen the estate's assets, if allowable. The first has to do with a claim of $76,528.29, plus interest, proposed by the Commissioner against petitioner for deficiencies in Nolan's income taxes for the years 1928 to 1936, inclusive. On August 3, 1943 a deputy collector wrote petitioner that this amount was "proposed for assessment against you" and suggested "a conference before final action is taken," setting a date for the proposed conference. No further action by the Commissioner appears to have been taken. We think it obvious in the circumstances that this is not such a claim as should be allowed as a deduction from the gross estate. It was wholly a contingent liability, contingent not only in the amount which might be collected but contingent in its very nature as a claim, for it was by no means certain that the Commissioner, when petitioner had put the necessary facts before him, would have taken any steps to pursue *377 it further. It was not a liability admitted by the petitioner and it had not been adjudicated. We can not now consider it as deductible from the gross estate in determining whether Nolan's estate was insolvent. The second claim in question is one for $139,297.71 on account of spirits tax duly assessed by Commissioner against Nolan and 14 other persons, including Al Capone, in 1935. In the 8 years intervening between its assessment and the trial of this case, only a portion of it had been collected from the others. The situation with regard to this claim differs from that previously discussed. Here the claim was formally asserted by the United States Government in 1935, two years before Nolan's death and its validity has never been questioned. Collections have been made on it. It was filed with the Probate Court in the spasmodic administration of Nolan's estate. While the estate was closed for a time and the administratrix discharged, and the claim has apparently not been refiled since the Probate Court revived the letters of the administratrix, nothing causes us to doubt that the claim is allowable and will be allowed upon its refiling and no assurance has been given that it will *378 not be refiled. We are not aware of any cases precisely in point but upon broad grounds of justice and good conscience it is unthinkable that the Federal government should collect taxes upon a decedent's gross estate undiminished by reason of a claim which it has already formally asserted against the decedent and his estate, the validity of which appears to be unquestioned and unquestionable. We therefore hold that a deduction on account of this claim be allowed to Nolan's estate subject to the following qualification: This claim has been assessed against Nolan and 14 other persons. Therefore while Nolan was personally liable for the entire amount he or his estate would have the right of contribution against those who are also liable on account of these taxes. The deduction on account of this claim allowable to Nolan's estate would be the amount of the claim less the value of his right of contribution against the others liable therefor. The value of this right has not been proved by the petitioner. Therefore we assume against her that it amounted to 14/15 of the claim. Therefore the deduction allowable to Nolan's estate on account of this claim in recomputing the estate taxes herein *379 will be in the amount of 1/15 of such claim plus interest. The claim for a penalty of 25 percent for petitioner's failure as statutory executrix to file an estate tax return for Nolan's estate is made by respondent, and should be allowed. We have determined the value of the Kankakee Beverage Co. bonds and the value of all other parcels of property has been stipulated. Those which we have indicated, in our particular consideration of them, as includible in Nolan's gross estate should therefore be included at these values, and the Federal estate tax reckoned accordingly under our Rule 50. 19. General Conclusion in Income Tax Case We turn now to docket No. 315, the income tax proceeding involving a deficiency in income tax of $189,839, and a 50 percent penalty for fraud, of $94,919.50, determined against petitioner for the calendar year 1937. Respondent in making this determination in 1942 held that petitioner in 1937 acquired property beneficially owned by Nolan of a net value of $336,137.39. His contention is that petitioner in 1937 appropriated this property to her own use and, in effect, embezzled it. He also determined that her failure to report this additional income *380 for 1937 which was in excess of 25 percent of the gross income which she did report for this year was fraudulent. In this case the burden of proof is on the respondent. It will not be necessary for us, however, to examine the evidence here for the purpose of determining whether there is proof that petitioner embezzled or appropriated to her own use in 1937 property beneficially owned by Nolan and to which his estate was entitled. On February 25, 1946, the Supreme Court held in , that taxable income is not derived by reason of embezzlement. Therefore, we are unable to conclude that petitioner, in 1937, realized taxable income in that year by reason of the misappropriation or embezzlement of any property beneficially owned by Nolan. Accordingly, the statute of limitations has run with regard to petitioner's income tax liability for the year 1937. Respondent also determined a deficiency of $148.06 in petitioner's income tax for the year 1938. Petitioner has sought to show error in regard to this determination in that respondent included in petitioner's gross income certain "redemption period net income" paid to holders of the St. *381 Anne Apartment bonds to which we have several times referred. It is petitioner's contention that the sums received by petitioner on this account "merely reduced to that extent the original cost basis of her bonds, and did not constitute income". Under our view of the facts petitioner is not entitled to any cost basis and therefore any sums received by her under claim of right on account of these bonds constituted income to her. See . In Dockets No. 233 and 234 decisions will be entered under Rule 50. In Docket No. 315 decision will be entered that there is no deficiency in petitioner's income tax for 1937 and no penalty; and that there is a deficiency in petitioner's income tax for 1938 in the sum of $148.06. Footnotes
*. Includes an increase in tax and penalty in the amounts of $7,444.73 and $1,861.19, respectively, claimed pursuant to Sec. 308 (e) of the Revenue Act of 1926.↩